43 A.3d 567 (2012)
304 Conn. 754
Charles D. GIANETTI
v.
NORWALK HOSPITAL et al.
Nos. 18549, 18550.
Supreme Court of Connecticut.
Argued November 29, 2011.
Decided May 15, 2012.
*573 Robert A. Lacobelle, for the appellant in Docket No. SC 18549 and the appellee in Docket No. SC 18550 (named defendant).
Alan Neigher, with whom was Sheryle S. Levine, Westport, for the appellee in Docket No. SC 18549 and the appellant in Docket No. SC 18550 (plaintiff).
NORCOTT, PALMER, ZARELLA, McLACHLAN, EVELEIGH, HARPER and VERTEFEUILLE, Js.
ZARELLA, J.
In this breach of contract action, which comes before the court for the third time in twenty-four years,[1] the named defendant, Norwalk Hospital,[2] appeals, and the plaintiff, Charles D. Gianetti, a retired plastic surgeon, appeals, from the judgment of the trial court rendered in favor of the plaintiff following a hearing in damages.[3] On appeal, the hospital claims that the trial court improperly (1) found that the plaintiff was a lost volume seller under the circumstances of this case, (2) concluded that there was sufficient evidence in the record to support a finding that the plaintiff proved damages with reasonable certainty for the years 1984 through 1988, and (3) precluded evidence relevant to the determination of damages regarding the parties' reasonable expectations as to the length of their contractual relationship. *574 In his appeal, the plaintiff claims that the trial court improperly (1) calculated the damage award,[4] (2) declined to award prejudgment and post-judgment interest, and (3) declined to award attorney's fees.[5] We affirm the judgment of the trial court.
The following relevant facts and procedural history are set forth in Gianetti v. Norwalk Hospital, 266 Conn. 544, 833 A.2d 891 (2003) (Gianetti II). "The plaintiff is a physician who specializes in the field of plastic and reconstructive surgery. In 1974, the plaintiff was granted provisional clinical privileges as a member of the hospital's medical staff. In 1976, the plaintiff was granted full clinical privileges as an assistant attending staff physician. The plaintiff's privileges were renewed on an annual basis through 1983. During this time period, the plaintiff also had clinical privileges at [several] other area hospitals [Bridgeport hospitals].
"In 1983, the last year for which the plaintiff was granted privileges, there were four plastic surgeons, including the plaintiff, who worked in conjunction with the hospital's emergency department. Neither the plaintiff nor the other plastic surgeons were required to remain physically at the hospital while `on call.' Rather, they were summoned to the hospital as their services were needed. Three of the plastic surgeons who covered call at the hospital also simultaneously covered call at other area hospitals. Each plastic surgeon was responsible for billing his patient or the patient's medical insurance carrier for any services performed.
"In 1983, the plaintiff applied for the renewal of privileges for 1984. On the basis of the recommendations of the hospital's department of surgery, section of plastic and reconstructive surgery and credentials committee, the medical staff of the hospital declined to renew the plaintiff's privileges for 1984. The hospital's board of trustees subsequently ratified the decision of the medical staff.
"In 1984, a year in which the plaintiff derived no income from services performed *575 at the hospital owing to the nonrenewal of his privileges, the plaintiff's gross income was $225,815. In 1983, the plaintiff earned $43,687 in gross income from services performed at the hospital and $172,890 in gross income from all other services performed, including services performed at [the Bridgeport] hospitals, for a total gross income of $216,577.
"In response to the nonrenewal of privileges, the plaintiff brought the present action against the hospital [in January, 1984], seeking, inter alia, damages and injunctive relief. The case thereafter was referred to an attorney trial referee, who concluded in his report [dated May 7, 1987] that an enforceable contract existed between the hospital and the plaintiff and, furthermore, that the hospital, through its employees and agents, had breached that contract by failing to follow the procedural requirements of its bylaws in declining to renew the plaintiff's privileges.
"The trial court subsequently accepted the referee's report[6] [on June 18, 1993] and rendered [an interlocutory] judgment in favor of the plaintiff on the issue of liability. The trial court then conducted a hearing to determine the appropriate remedy, after which the court declined to grant the plaintiff injunctive relief [in a decision dated September 9, 1999] because he did not prove that he had suffered irreparable harm or that he was without an adequate remedy at law. In addition, the court awarded the plaintiff $1 as nominal damages, reasoning that the evidence adduced by the plaintiff did not provide a basis for finding any economic loss or damages arising out of the hospital's breach of contract. The court based its award of nominal damages on its determination that the plaintiff was not a lost volume seller inasmuch as he [had] provided personal services to the hospital and that, consequently, the doctrine of mitigation of damages applied. Thus, the court rendered judgment awarding the plaintiff nominal damages only.
"The plaintiff thereafter appealed to the Appellate Court. The Appellate Court affirmed the trial court's denial of injunctive relief but reversed that part of the judgment awarding nominal damages. Gianetti v. Norwalk Hospital, 64 Conn.App. 218, 233, 779 A.2d 847 (2001). The Appellate Court concluded that the lost volume seller theory can apply to personal service contracts such as the one between the plaintiff and the hospital; see id., at 226, 230, 779 A.2d 847; and that, in light of the evidence contained in the record, the trial court should have deemed the plaintiff a lost volume seller and should have awarded him damages equal to his lost profits in 1984 only. Id., at 231, 779 A.2d 847. Thus, the Appellate Court remanded the case to the trial court for a new hearing in damages with guidance on the appropriate method of calculating damages. See id., at 233, 779 A.2d 847.
"We thereafter granted the hospital's petition for certification to appeal limited *576 to two issues. First, `[d]id the Appellate Court properly conclude that the plaintiff was a lost volume seller?' ... Gianetti v. Norwalk Hospital, 258 Conn. 945, 788 A.2d 95 (2001). Second, `[d]id the Appellate Court properly conclude that the plaintiff was not required to mitigate damages ... and that he was entitled to more than nominal damages?' Id., at 946 [788 A.2d 95]. We also granted the plaintiff's petition for certification to appeal limited to the following issue: `Did the Appellate Court properly conclude that, on the remand, the plaintiff was entitled to prove damages for only one year?' Gianetti v. Norwalk Hospital, 258 Conn. 946, 788 A.2d 95 (2001)." Gianetti v. Norwalk Hospital, supra, 266 Conn. at 547-51, 833 A.2d 891.
On appeal, we determined that the Appellate Court properly had concluded as a matter of law that the lost volume seller theory applies to personal services contracts but that the Appellate Court's conclusion regarding the plaintiff's status as a lost volume seller under the circumstances of this case had been incorrect. See id., at 571, 833 A.2d 891. We noted that the issue of whether a party qualifies as a lost volume seller is one of fact. Id., at 560, 833 A.2d 891. We also observed that it is not ordinarily the function of a reviewing court to make factual findings and that conclusions of fact may be drawn on appeal "only where the subordinate facts found [by the trial court] make such a conclusion inevitable as a matter of law... or where the undisputed facts or uncontroverted evidence and testimony in the record make the factual conclusion so obvious as to be inherent in the trial court's decision." (Internal quotation marks omitted.) Id. Under this high standard, "[t]he evidence in the record was inadequate for the purpose of determining whether the plaintiff had possessed the capacity and intent to perform under the contract with the hospital while simultaneously assuming an increased workload at the [Bridgeport] hospitals. Accordingly, any conclusions derived from those facts that are relevant to the first and third prongs of the lost volume seller test were improper." Id., at 571, 833 A.2d 891. We also concluded that the record supported the Appellate Court's determination that "it would have been profitable for the plaintiff to perform under the contract with the hospital while also assuming an increased workload at the [Bridgeport] hospitals"; id., at 563-64 n. 10, 833 A.2d 891; but that "the Appellate Court improperly [had] determined that the plaintiff was entitled to damages for lost profits in 1984 only. The proper remedy under these circumstances [was] to remand the case for a new hearing to afford the trial court an opportunity to determine damages with due consideration of the lost volume seller theory and to make factual findings to that end, after which a reviewing court properly [could] determine whether the trial court's factual findings and its conclusions concerning the amount of damages to which the plaintiff is entitled [were] supported by the record." Id., at 571, 833 A.2d 891. We thus affirmed the judgment of the Appellate Court insofar as it upheld the trial court's denial of injunctive relief but otherwise reversed the judgment and remanded the case for further proceedings. Id.
On remand, the trial court conducted a hearing in damages and, in a memorandum of decision dated April 15, 2009, found that the plaintiff was a lost volume seller under the circumstances of the case. The court also found that, because the plaintiff was a lost volume seller, he was not required to mitigate his damages. The court then determined that the plaintiff had proven lost profits for the years 1984 through 1988 with a reasonable degree of certainty and awarded him damages in the amount of $258,610 plus costs. These appeals followed. *577 Additional facts will be set forth as necessary.

I

THE HOSPITAL'S APPEAL

A

Lost Volume Seller
The hospital first claims that the trial court improperly found that the plaintiff was a lost volume seller. The hospital specifically claims that the plaintiff failed to prove by a preponderance of the evidence that, in the years following the termination of his privileges in 1983, (1) he had the capacity to continue working at Norwalk Hospital while also handling the increased workload at the Bridgeport hospitals, (2) it would have been profitable for him to take on the additional workload at the Bridgeport hospitals, and (3) he probably would have assumed the additional workload at the Bridgeport hospitals even if his privileges at Norwalk Hospital had not been terminated. The plaintiff responds that he had the capacity to perform work at all of the hospitals simultaneously in 1984, that this court conclusively established that it would have been profitable for him to assume the increased workload at the Bridgeport hospitals and that his own testimony demonstrates that he would have handled the increased workload even if his privileges at Norwalk Hospital had not been terminated. We agree with the plaintiff.
The following additional facts are relevant to our resolution of this issue. In its memorandum of decision, the trial court made several factual findings. Among these findings were that (1) the plaintiff "covered the plastic surgery needs of the emergency rooms [at Norwalk Hospital and the Bridgeport hospitals] for the years 1974 to 1983 on a rotation basis with two other plastic surgeons," (2) the plaintiff "covered the plastic surgery needs of the emergency rooms [at two of the Bridgeport hospitals] for the years 1984 to 2001 on a rotation basis with other plastic surgeons and emergency room doctors," (3) "[t]he need for plastic surgeons in all the emergency rooms diminished over time because emergency room doctors, employees of the hospital, called upon plastic surgeons, less and less," and (4) "[p]lastic surgeons who covered the emergency rooms on rotation were not employees of the hospital and were required to bill and collect their fees independently for any procedure that they were called upon to perform." On the basis of these findings, the trial court concluded that all three prongs of the lost volume seller test had been satisfied. See generally Gianetti v. Norwalk Hospital, supra, 266 Conn. at 554, 833 A.2d 891 (setting forth three prongs of lost volume seller test). The trial court explained that the first prong of the test was satisfied because "[t]he services performed in 1974 through 1983 demonstrate the capability of [the plaintiff] to perform services simultaneously at Norwalk Hospital and the Bridgeport hospitals." The second prong of the test also was satisfied because this court had determined in Gianetti II that "the record supports the Appellate Court's conclusion that it would have been profitable for the plaintiff to perform under the contract with the hospital while assuming an increased workload at the [Bridgeport] hospitals." Gianetti v. Norwalk Hospital, supra, 266 Conn. at 563-64 n. 10, 833 A.2d 891. Finally, the third prong of the test was satisfied because "the plaintiff was furnishing services to the [Bridgeport] hospitals prior to the termination and continued to furnish those services after his termination."
We begin our analysis by setting forth the standard of review. "The determination *578 of whether a party qualifies as a lost volume seller involves questions of fact to be resolved according to the circumstances of each case." (Internal quotation marks omitted.) Id., at 560, 833 A.2d 891. We thus review the trial court's findings to determine whether they are clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it ... or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.... Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings.... In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached.... Instead, we make every reasonable presumption... in favor of the trial court's ruling." (Internal quotation marks omitted.) Ackerman v. Sobol Family Partnership, LLP, 298 Conn. 495, 507-508, 4 A.3d 288 (2010).
With respect to the applicable legal principles, "[c]omment (f) to § 347 of the Restatement (Second) of Contracts provides that, in cases in which a contract has been breached, if there is a factual finding that an `injured party could and would have entered into the subsequent contract, even if the [underlying] contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract.' 3 Restatement (Second), Contracts § 347, comment (f), p. 117 (1981). Thus, `[t]he lost volume seller theory allows [for the] recovery of lost profits despite resale of the services that were the subject of the terminated contract if the seller ... can prove that he would have entered into both transactions but for the breach.' ... Although the lost volume seller theory is commonly understood to apply to contracts involving the sale of goods, it applies with equal force to contracts involving the performance of personal services such as employment contracts. 22 Am.Jur.2d 592, Damages § 509 (1988).
"To qualify as a lost volume seller, a party must prove that the subsequent contract is not a substitute for the opportunity that has been lost as a result of the breach. See 3 Restatement (Second), supra, at § 350, comment (d), p. 129. `A "substitute" is a contract which a volume seller who has suffered the loss of one contract through the breach of another party has entered into in place of the broken contract and which the volume seller would not have been able, with his existing personnel and overhead costs, to perform had there been no breach.' ...
"Therefore, `a party claiming to be a lost volume seller must establish that it would have had the benefit of both the original contract and the subsequent contracts had there not been a breach.... This test has both objective and subjective components.' . . . Specifically, `to recover lost profits under [the lost volume seller] theory, a [nonbreaching] party must prove three things: [1] that the seller of services had the capability to perform both contracts simultaneously; [2] that the second contract would have been profitable; and [3] that the seller of services probably would have entered into the second contract even if the first contract had not terminated.'" (Citations omitted.) Gianetti v. Norwalk Hospital, supra, 266 Conn. at 552-54, 833 A.2d 891. The party claiming to be a lost volume seller has the burden of proving lost volume seller status by a preponderance of the evidence. See Gianetti v. Norwalk Hospital, supra, 64 Conn.App. at 228, 779 A.2d 847.
*579 Mindful of these principles, we conclude, with respect to the first prong of the test, that the trial court's determination that the plaintiff had the capacity to continue working at Norwalk Hospital in 1984, in addition to taking on the increased workload at the Bridgeport hospitals, was not clearly erroneous. Although the number of cases that the plaintiff handled at the Bridgeport hospitals increased dramatically from approximately 130 in 1983 to 263 in 1984,[7] there is no evidence in the record that the plaintiff would have had difficulty handling the increased workload or that he would not have had sufficient time to satisfy his emergency room obligations at all of the hospitals during that year. The plaintiff testified that he shared on-call duties at Norwalk Hospital with two other plastic surgeons from 1978 through 1981, and with three other plastic surgeons in 1982 and 1983, and that the number of days each was scheduled for on-call duty was divided equally among them. In other words, the plaintiff was scheduled for on-call duty at Norwalk Hospital approximately 120 days each year from 1978 through 1981, and approximately 90 days in 1982 and 1983. The plaintiff further testified that 60 to 70 percent of the procedures that he performed were only one and one-half to two and one-half hours in length and that the remaining 30 to 40 percent were from two and one-half to three hours in length, thus leaving ample time for him to perform more procedures each day that he was scheduled for on-call duty at the hospitals. Indeed, the record shows that, on many days prior to 1984, the plaintiff not only performed multiple procedures but performed them at different hospitals, including Norwalk Hospital,[8] and that, on some days, he performed multiple procedures at more than one hospital.[9] Thus, on one particularly busy day in 1982, the plaintiff handled one case at each of four hospitals, and, on another day in 1980, he handled one case at each of two Bridgeport hospitals and three cases at Norwalk Hospital. Accordingly, the statistical evidence alone supports the trial court's conclusion that the plaintiff had the capacity in 1984 to handle the increased workload at the Bridgeport hospitals while continuing to work at Norwalk Hospital *580 because, even if he had on-call duty only ninety days at Norwalk Hospital in 1984, and even if some of those days overlapped with his on-call days at the Bridgeport hospitals, he conceivably could have handled a combined total of more than 300 cases annually in all locations if he had three or four cases on each of those ninety days.[10]
Furthermore, the trial court was entitled to credit the plaintiff's testimony that he would have been able to perform his duties at all of the hospitals simultaneously in 1984, and there is no contrary evidence that he could not have done so because of the commuting distance between his office and the hospitals[11] or because of other constraints. The plaintiff also testified that he was never unable to attend to an emergency room call at any of the Bridgeport hospitals while he was in Norwalk or, conversely, that he was unable to attend to an emergency room call at Norwalk Hospital while he was in Bridgeport. The plaintiff explained that, if he received a call from more than one hospital on any given day, he would respond first to the initial call and then proceed to the second or third hospital in sequential order. The plaintiff further testified that, to his knowledge, two other physicians with whom he had shared on-call rotation at the hospitals were able to cover their on-call work in Bridgeport without any difficulty from 1984 through the mid-1990s while continuing to work on rotation at Norwalk Hospital.
Relying on Penncro Associates, Inc. v. Sprint Spectrum, L.P., 499 F.3d 1151 (10th Cir.2007), the hospital contends that the reason why the plaintiff was able to handle more than double the number of cases at the Bridgeport hospitals in 1984 than he had handled in prior years was because his privileges at Norwalk Hospital had been terminated, thus making more time available for him to work at the Bridgeport hospitals. See id., at 1161-62 (concluding that plaintiff was not lost volume seller because it had capacity to assume additional work only by virtue of fact that defendant had terminated parties' contract). In support of this claim, the hospital points to evidence that the plaintiff had no large yearly swings of income earned or lost at any one hospital prior to 1984 without a corresponding loss or gain of income at another hospital. We disagree for at least two reasons. First, the plaintiff and other witnesses testified that the number of on-call emergency room cases arising on any particular day was due to the purely random number of accidents that happened to occur, a fact that the hospital also acknowledged in its brief to this court. In other words, the plaintiff would have been required to handle the same number of cases at the Bridgeport hospitals even if his privileges at Norwalk Hospital had not been terminated. Second, the increase in workload[12] far exceeded the average number *581 of cases that the plaintiff had handled at Norwalk Hospital during any previous year.[13] Accordingly, the fact that the plaintiff may have had more time available because he no longer worked at Norwalk Hospital had nothing to do with his increased workload at the Bridgeport hospitals.
As for his annual swings in income, the plaintiff testified that his fee for each case varied with its complexity and that the amount of income that he derived each year from any of the hospitals was not only a function of the number of cases at that hospital but of the type of procedures that he performed. Thus, because the average fee for his 263 Bridgeport cases in 1984 was only $535, his income of $140,705 from those cases was substantially lower than his income of $208,000 in 1986 from only 106 cases, for which the average fee was $1300. We thus conclude that the evidence does not support the hospital's contention that the plaintiff was able to handle the increased workload in the Bridgeport hospitals only by virtue of the termination of his privileges at Norwalk Hospital and that he did not have the requisite capacity to handle cases at all of the hospitals simultaneously in 1984.
The hospital argues that a lost volume seller is one that has unlimited resources or production capacity, and that the plaintiff in this case had a limited ability to conduct business in the manner that he did over the six year period prior to the termination of his privileges because he was physically capable of performing only a limited number of procedures each year. We disagree. The concept of capacity in this context is not absolute, and is not intended to focus on a theoretical ability to supply unlimited services but on a practical ability to continue providing the services lost as well as those added after the contract was terminated. See J. Holisky, comment, "Finding the `Lost Volume Seller': Two Independent Sales Deserve Two Profits Under Illinois Law," 22 J. Marshall L.Rev. 363, 379-80 (1988). Consequently, there being no evidence in the record that counters the plaintiff's testimony that he had sufficient capacity in 1984 to handle cases at all of the hospitals simultaneously, we conclude that the trial court's finding that the plaintiff had sufficient capacity to qualify as a lost volume seller under the first prong of the test was not clearly erroneous.
The hospital further argues that the only evidence in the record that the plaintiff could handle all of his on-call work at the hospitals and that he never missed a call was in the form of his own testimony but that there was other testimony that the plaintiff could not always be located to service emergency room calls or respond to on-call needs. The hospital thus claims that the trial court could not have concluded that the plaintiff's testimony alone constituted the required overwhelming and uncontroverted evidence of his capacity to handle cases at Norwalk Hospital while also assuming an increased workload at the Bridgeport hospitals. This claim has no merit.
Insofar as the hospital argues that there was testimony from other plastic surgeons that the plaintiff could not always be located to handle an emergency room call, "[i]t is well established that [i]t is within the province of the trial court, when sitting as the fact finder, to weigh *582 the evidence presented and determine the credibility and effect to be given the evidence.... Credibility must be assessed... not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude.... An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] ... [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) State v. Lawrence, 282 Conn. 141, 155, 920 A.2d 236 (2007). Thus, the trial court was entitled to credit the plaintiff's testimony that he would have been able to handle cases at all of the hospitals simultaneously in 1984, that he never missed a call at any of the hospitals and that, if he was working at one hospital when he received a call from another, he would complete his work at the first hospital and then go to the second. Moreover, even if the plaintiff missed occasional calls, that fact alone would have little or no significance in light of the large number of cases that he handled in 1984.
Finally, the trial court was not required to rely on uncontroverted and overwhelming evidence to conclude that the plaintiff had the required capacity, as the hospital contends. The hospital refers to our conclusion in Gianetti II that "the limited evidence in the record concerning the plaintiff's capacity and intent to perform under the contract with the hospital while simultaneously assuming an increased workload at the other hospitals [was] neither uncontroverted nor sufficiently clear as to warrant the conclusion that the plaintiff [was] a lost volume seller as a matter of law." (Emphasis added.) Gianetti v. Norwalk Hospital, supra, 266 Conn. at 561, 833 A.2d 891. In Gianetti II, however, we applied the higher standard and reversed the Appellate Court's judgment because the trial court had made no factual finding as to whether the plaintiff was a lost volume seller, and a reviewing court cannot make a factual determination unless the record contains such uncontroverted and overwhelming evidence that the factual determination would be inevitable as a matter of law, a principle that the Appellate Court overlooked. See id., at 562-63, 571, 833 A.2d 891. We thus remanded the case to the trial court to determine whether the plaintiff was a lost volume seller. Id., at 563, 571, 833 A.2d 891. The trial court now having made that determination, this court cannot apply the standard of "uncontroverted" and "overwhelming" evidence in the present appeal; id., at 562, 833 A.2d 891; but must decide whether the trial court's finding was clearly erroneous. In other words, we must determine whether "there is no evidence in the record to support [the trial court's finding] ... or when although there is evidence to support it, [on the entire evidence we are] left with the definite and firm conviction that a mistake has been committed.... [W]e [thus] do not examine the record to determine whether the [trial court] could have reached a conclusion other than the one reached.... Instead, we make every reasonable presumption ... in favor of the trial court's ruling." (Internal quotation marks omitted.) Ackerman v. Sobol Family Partnership, LLP, supra, 298 Conn. at 507-508, 4 A.3d 288. Accordingly, we conclude that the trial court's finding that the plaintiff had the capacity in 1984 to handle cases at all of the hospitals simultaneously was not clearly erroneous.
We next consider, under the second prong of the lost volume seller test, whether it would have been profitable for the plaintiff to have continued working at Norwalk Hospital in 1984 while also assuming *583 the increased workload at the Bridgeport hospitals. The hospital argues that the cost effectiveness of handling cases in both Norwalk and Bridgeport would have resulted in lost income when the Norwalk cases took the plaintiff away from his Bridgeport practice. We disagree. In Gianetti II, this court affirmed the Appellate Court's determination in Gianetti v. Norwalk Hospital, supra, 64 Conn.App. at 229, 779 A.2d 847, that it would have been profitable for the plaintiff to continue working at Norwalk Hospital in 1984 while also assuming the increased workload at the Bridgeport hospitals.[14] See Gianetti v. Norwalk Hospital, supra, 266 Conn. at 563-64 n. 10, 833 A.2d 891. Accordingly, this court conclusively established in Gianetti II that the profitability prong of the test had been satisfied.
Turning to the third prong of the test, we conclude that the trial court properly determined that the plaintiff would have performed the additional work at the Bridgeport hospitals even if his privileges at Norwalk Hospital had not been terminated. The plaintiff testified that he had maintained privileges at all of the hospitals, subject to annual renewal at each hospital, for six years before his privileges at Norwalk Hospital were terminated without knowing exactly how many on-call cases he would be asked to handle at each hospital, and that he fully intended to, and did, continue maintaining his privileges at the Bridgeport hospitals after 1983. In addition, the plaintiff testified that he never was unable to respond to an on-call case at any of the hospitals. The evidence thus established that the plaintiff would have continued his affiliations with the Bridgeport hospitals and handled the increased workload at those hospitals in 1984 even if *584 his privileges at Norwalk Hospital had not been terminated.
The hospital reiterates that the only reason that the plaintiff handled more cases at the Bridgeport hospitals in 1984 was because the termination of his privileges at Norwalk Hospital made more time available for him to work in Bridgeport. Although the hospital concedes that the plaintiff's ability to handle the increased workload in Bridgeport indicates that the plaintiff did not reach his capacity before 1984, it argues that, given the dramatic increase in the number of Bridgeport cases in 1984, the plaintiff would have been constrained by the commuting distance between Norwalk and Bridgeport from handling the increased workload in Bridgeport if his privileges had not been terminated. The hospital also contends that the fact that the plaintiff never sought additional employment opportunities with any other hospital following the termination of his privileges suggests that his capacity had been reached by virtue of the increased workload at the Bridgeport hospitals. We disagree.
To the extent the hospital repeats its argument that termination of the plaintiff's privileges at Norwalk Hospital gave him more time in 1984 to assume an increased workload in Bridgeport, we reject that argument for all of the same reasons discussed in our prior analysis. We also reject the hospital's argument that the plaintiff's failure to seek work at other hospitals suggests that he recognized that he had no further capacity to handle cases in Norwalk. As previously stated, it is within the province of the trial court to determine credibility; see, e.g., State v. Lawrence, supra, 282 Conn. at 155, 920 A.2d 236; and, accordingly, the trial court was entitled to credit testimony by the plaintiff that he did not apply for privileges at Griffin Hospital in the town of Derby, another local hospital, because it was too far away geographically, he had been advised not to apply for privileges at Griffin Hospital because of the prior termination of his privileges at Norwalk Hospital, and he did not want his record to reflect a possible rejection. We therefore conclude that the trial court's finding that the plaintiff was a lost volume seller was not clearly erroneous.

B

Sufficiency of Evidence
The hospital next claims that the trial court improperly concluded that the record contained sufficient evidence to support a finding that the plaintiff proved damages with reasonable certainty for the years 1984 through 1988. The hospital claims that the damage award was highly speculative because the calculations were affected by a large number of variables that would have limited the plaintiff's profitability after 1983. The hospital specifically contends that the plaintiff's models for calculating damages, on which the trial court partially relied, failed to consider that the plaintiff shared his on call work at the hospital with only two other plastic surgeons from 1978 through 1981, and that his on call work was wholly unpredictable because the need for plastic surgery procedures was a function of the number of accidents involving patients that required emergency room treatment. In addition, the hospital contends that there was no evidence that it would have granted the plaintiff privileges for five more years, especially in light of their rapidly deteriorating and turbulent relationship in 1983, let alone that the relationship would have remained profitable for the plaintiff over that length of time. The plaintiff responds that the record contained sufficient evidence to support the trial court's finding that he proved damages with reasonable certainty *585 for the years 1984 through 1988. The plaintiff argues that evidence of his deteriorating relationship with the hospital is relevant only as to liability, which already had been established, and that the calculation of damages must be based on the intent of the parties to engage in a long-term relationship when they entered into a contractual relationship in 1974. We conclude that the evidence was sufficient to support the trial court's finding that the plaintiff proved damages with reasonable certainty for the years 1984 through 1988.
The following additional facts are relevant to our resolution of this claim. After the trial court concluded that the plaintiff was not required to mitigate his damages because he was a lost volume seller, it noted that the plaintiff had the burden of proving lost profits with reasonable certainty, describing such profits as the amount that the plaintiff would have earned from the performance of work at Norwalk Hospital were it not for the breach, less any cost attributable to the performance of this work. The court acknowledged that any calculation of the plaintiff's potential earnings at the hospital from 1984 through 2001 would be subject to many variables, including (1) the number of plastic surgery procedures needed by the hospital's emergency room, (2) the number of plastic surgeons on rotation to cover those needs,[15] (3) the number of plastic surgery procedures performed by emergency room physicians other than plastic surgeons, (4) the diminution of injuries requiring plastic surgery due to increased usage of seat belts and air bags, (5) the reduction in fee reimbursement by health insurance companies, (6) the number of uninsured patients who do not pay for their treatment, and (7) the rise in fees for surgical procedures due to cost-of-living adjustments.
In light of these variables, the trial court concluded that the plaintiff had sustained his burden of proof only for the years 1984 through 1988. The court explained that the effect of the variables during those years would be reasonably similar to their effect during the prior six years, and, consequently, a projection of lost profits could be made with reasonable certainty for the years immediately following the termination of the plaintiff's privileges. The court also concluded, however, that the cumulative effect of the variables for the years after 1988 was "so substantial" that any finding of lost profits would be based on "surmise and conjecture."
The court then adopted one of several formulas suggested by the plaintiff as a basis for calculating his potential earnings for the years 1984 through 1988. The formula was premised in part on the assumption that the plaintiff would have treated at least eighty-eight patients at the hospital[16] each year following the termination of his contract. Employing this formula, the court concluded that the plaintiff would have had a total gross income from his work at Norwalk Hospital of $427,842, total deductions of $169,232, and a net lost profit of $258,610.
The legal principles that govern our review of damage awards are well established. We have recognized that "[t]he trial court has broad discretion in *586 determining damages.... The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous.... [W]hether the decision of the trial court is clearly erroneous... involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. ... In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony.... On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled.... A factual finding may be rejected by this court only if it is clearly erroneous.... A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed....
"We are, therefore, constrained to accord substantial deference to the fact finder on the issue of damages. In deciding whether damages properly have been awarded, however, we are guided by the well established principle that such damages must be proved with reasonable certainty.... Although we recognize that damages for lost profits may be difficult to prove with exactitude... such damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty.... Consequently, we have permitted lost profits to be calculated by extrapolating from past profits.... We have stated, however, that the plaintiff cannot recover for the mere possibility of making a profit.... A damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence....
"In order to recover lost profits, therefore, the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty." (Citations omitted; internal quotation marks omitted.) Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, 247 Conn. 48, 68-70, 717 A.2d 724 (1998).
We conclude that there was sufficient evidence in the record for the trial court to calculate the plaintiff's lost profits with reasonable certainty. The court did not ignore the variables that affected the plaintiff's potential earnings from 1984 through 1988 but expressly identified and addressed them at the outset of its decision, determining that their effect was reasonably similar during those years to their effect during the preceding years. The court noted evidence in the record that the number of plastic surgeons on call at Norwalk Hospital from 1984 through 1988 was the same, or only slightly greater than, the number of plastic surgeons on call at Norwalk Hospital from 1978 through 1982. See footnote 15 of this opinion. With respect to the unpredictable number of emergency room cases that the plaintiff would have handled in any given year, the court accepted the plaintiff's estimate that the median number of cases from 1984 through 1988 would have remained the same as the median number of cases from 1978 through 1982, which was not unreasonable in light of evidence that the number of cases that he handled from 1978 *587 through 1982 did not fluctuate wildly.[17] The trial court's reliance on the median number of cases also was not unreasonable given that any potential increase in the number of Norwalk cases, similar to the increase in the number of Bridgeport cases from 1984 through 1988,[18] very likely would have been offset by the increased number of on-call plastic surgeons at Norwalk Hospital in 1986, 1987 and 1988. Moreover, there is no evidence that the effect of any of the other variables identified by the court, such as the number of plastic surgery procedures performed by emergency room physicians other than plastic surgeons and the reduction in injuries requiring plastic surgery due to increased use of seat belts and air bags, occurred immediately rather than gradually after 1984.
To the extent that the hospital claims that the trial court's calculation of lost profits was speculative because the supposition that a five year relationship would have continued is contradicted by evidence that its relationship with the plaintiff was turbulent in 1983, the year in which his privileges were terminated, we disagree. The trial court specifically addressed that issue, scoured the record and concluded that the hospital's contractual relationship with the plaintiff would have been the same as it was with the other on-call plastic surgeons who had been working at Norwalk Hospital from 1984 to 1988 and that it had found no evidence indicating that the hospital would not have continued its contractual relationship with any of the other plastic surgeons. Moreover, there is no reason why the parties' turbulent relationship in 1983 would have had any effect on the trial court's conclusion because, without the required hospital hearing, it was not possible to determine how a full discussion of the issues would have affected the parties' future relationship. See part I C of this opinion. Accordingly, the trial court properly declined to differentiate between the plaintiff and the other on-call plastic surgeons working at Norwalk Hospital in discussing prospects for the parties' continued relationship over the next five years.
The hospital, relying on Westport Taxi Service, Inc. v. Westport Transit District, 235 Conn. 1, 664 A.2d 719 (1995), and Humphrys v. Beach, 149 Conn. 14, 175 A.2d 363 (1961), argues that the proper basis for estimating the plaintiff's lost profits was the income that he received from his work at Norwalk Hospital in the year preceding the termination of his privileges. Both of those cases, however, are inapposite. In Westport Taxi Service, Inc. v. Westport Transit District, supra, at 3, 12, 664 A.2d 719, in which the plaintiff sought damages for injuries caused by an antitrust violation involving predatory pricing, we stated that a plaintiff injured by an antitrust violation may recover lost past profits for the probable value of the business and the time that the defendant directly competed with the plaintiff, which had been approximately fourteen months. Id., at 32, 33, 664 A.2d 719. Similarly, in Humphrys, the plaintiff, who was the owner of a barn that was destroyed by a fire, sought damages to recover for his loss of the barn, his equipment, two horses and his profits for the fifteen months that he *588 was out of business because of the fire. Humphrys v. Beach, supra, at 15-16, 20, 175 A.2d 363. The circumstances in the present case are distinguishable. We therefore conclude that the hospital's claim has no merit and that there was sufficient evidence in the record to support the trial court's finding that the plaintiff proved damages with reasonable certainty for the years 1984 through 1988.

C

Admissibility of Evidence
The hospital next claims that the trial court improperly precluded relevant evidence directly related to the parties' reasonable expectations as to the length of the contractual relationship and the determination of damages. The hospital claims that, although the plaintiff may have intended to perform work at Norwalk Hospital indefinitely, the excluded evidence demonstrated that the hospital wanted to remove the plaintiff from the emergency room rotation because he was increasingly unavailable to cover the procedures due to his simultaneous obligations at the Bridgeport hospitals. Consequently, the hospital claims that the evidence would have demonstrated that the hospital's intention was not to allow the plaintiff to continue working at Norwalk Hospital. The plaintiff responds that the excluded evidence is irrelevant because its goes to the issue of liability rather than damages, and the relevant question is the intention of the parties when they first entered into a contractual relationship in the 1970s. We conclude that the trial court properly excluded the proffered evidence.
The following additional facts are necessary to our resolution of this issue. At the hearing in damages, the hospital made several attempts to introduce evidence that the plaintiff missed emergency room calls, did not follow directions or hospital policies, and that his rotational schedule was "reduced drastically or eliminated completely." This evidence included (1) a letter to the plaintiff from the hospital's acting chairman of the department of surgery, dated April 8, 1983, discussing the plaintiff's tardiness and unavailability for emergency room duties, (2) a letter to the plaintiff from the hospital's chief of plastic and reconstructive surgery, dated July 21, 1983, reminding the plaintiff that he was under supervision and that he was not allowed to perform surgical procedures without his supervisor present, and (3) a letter to the plaintiff from the hospital's chairman of the department of surgery, dated December 20, 1983, informing the plaintiff that his surgical privileges had been suspended because he had treated a patient in the emergency room without notifying his supervisor. The trial court sustained the plaintiff's objections, however, and did not admit the letters into evidence. Other documents that the hospital proffered but that the court declined to admit included a recommendation, dated September 22, 1983, from the chairman of the department of surgery to the chairman of the hospital's credentials committee, a record of the minutes of an October 4, 1983 meeting of the credentials committee regarding the reappointment of individuals applying for privileges with the hospital's department of surgery for the years 1983 through 1984, and the meeting minutes dated September 13, 1983, of the hospital's plastic surgery section reflecting that the department was not planning to include the plaintiff in the emergency room rotation in 1984. The trial court also sustained the plaintiff's objections to testimony from various witnesses regarding the plaintiff's behavior in 1983. For example, the court did not allow Carmine Calabrese, a plastic surgeon who worked at Norwalk Hospital at the same time as the plaintiff, *589 to explain his reasons for no longer referring cases to the plaintiff after 1984. Similarly, Lynda Nemeth, the hospital's director of risk management at the time of the hearing in damages, was not allowed to testify as to why the plaintiff was placed under supervision in 1983 or answer questions regarding the plastic surgery section meeting minutes and the hospital's on-call rotation schedule for 1984.
Thereafter, the trial court concluded that the parties reasonably could have expected their contractual relationship to continue through 1988 because the hospital had continued the privileges of two other plastic surgeons who had practiced at Norwalk Hospital while also maintaining their privileges at the Bridgeport hospitals. The court also concluded that it was not necessary to determine the expectations of the parties beyond 1988 because the plaintiff had failed to prove lost profits after that year.
Following the trial court's ruling and the hospital's appeal, the hospital filed a motion for articulation of the trial court's decision to exclude the proffered evidence. The hospital argued that the excluded evidence and testimony were relevant and necessary to determine the parties' reasonable expectations as to the length of the contractual relationship, which would directly affect the award of damages for lost profits. In response, the trial court articulated that "[t]he rejection of said evidence was based on relevancy. The content of the offered evidence went to the claimed causes of the plaintiff being denied hospital privileges. Those issues were relevant to the hearing that was never held in accordance with the [hospital's] bylaws."
"A trial court's ruling on the admissibility of evidence is entitled to great deference.... [T]he trial court has broad discretion in ruling on the admissibility... of evidence ... [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion.... We will make every reasonable presumption in favor of upholding the trial court's ruling.... Moreover, evidentiary rulings will be overturned on appeal only where there was ... a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) Connecticut Light & Power Co. v. Gilmore, 289 Conn. 88, 109, 956 A.2d 1145 (2008).
In Gianetti II, we stated that "the plaintiff had a right to reappointment until the governing authorities determined after a hearing conforming to the minimum requirements of procedural due process that he did not meet the reasonable standards of the hospital.... The fact that review of this appointment [was] made mandatory on an annual ... basis ... [could] by no means be said to render it probationary or tentative in effect." (Citation omitted; internal quotation marks omitted.) Gianetti v. Norwalk Hospital, supra, 266 Conn. at 568-69, 833 A.2d 891. We then added: "[B]efore we can properly review the rights and duties arising out of [the parties'] contractual relationship, it is essential to determine [t]he intention of the parties manifested by their words and acts.... Thus, before any determination can be made with respect to the amount of damages to which the plaintiff is entitled as a result of the hospital's breach, it first must be determined how long the parties reasonably expected the contractual relationship to extend. See HLO Land Ownership Associates Ltd. Partnership v. Hartford, 248 Conn. 350, 356-57, 727 A.2d 1260 (1999) ([t]he intention of the parties to a contract is to be determined from ... [inter alia] the circumstances connected with the transaction ...). Such inquiry, being a determination of the parties' intent, is a question of fact....
*590 "Accordingly, upon remand, in order to determine the appropriate time period for calculating the plaintiff's lost profits, the trial court must also determine how long the parties reasonably could have expected the contractual relationship to have continued." (Citations omitted; internal quotation marks omitted.) Gianetti v. Norwalk Hospital, supra, 266 Conn. at 569-70, 833 A.2d 891.
As indicated in the foregoing passages, the intent of the parties to a contract is to be determined from the circumstances connected with the transaction. In Gianetti I, we concluded that the "transaction" occurred when the hospital initially granted privileges to the plaintiff in the 1970s. See Gianetti v. Norwalk Hospital, 211 Conn. 51, 54, 63, 557 A.2d 1249 (1989). We explained that, "[i]n granting privileges, [the] hospital extended to the plaintiff those benefits to his medical practice that are to be gained by the use of the hospital, including its facilities and admissions to the hospital.... In return for that, the plaintiff agreed to abide by its medical staff bylaws. Therefore, the requisite contractual mutuality was then present.... The hospital changed its position by granting medical staff privileges and the plaintiff physician has likewise changed his position in doing something he was not previously bound to do, i.e., to `abide' by the hospital medical staff bylaws. Therefore, there is a contractual relationship between the hospital and the plaintiff." (Citations omitted.) Id.
The evidence that the hospital proffered on the issue of intent at the trial court's most recent hearing in damages, however, related to conduct by the plaintiff and communications between the parties in 1983, nearly one decade later. Although the evidence and testimony that the hospital offered may have been relevant to the issue of liability, it was not relevant to the parties' expectations when they entered into a contractual relationship. Moreover, even if the proffered evidence and testimony suggested that that hospital was not happy in 1983 with the plaintiff's conduct, without the required hearing during which the plaintiff would have had an opportunity to present possibly mitigating evidence, no conclusion can be drawn as to whether the parties might have been able to resolve their differences and to continue their relationship as it previously existed. Accordingly, we conclude that the trial court acted within its broad discretion in excluding the proffered evidence on the ground of relevancy.

II

THE PLAINTIFF'S APPEAL

A

Calculation of Damages
The plaintiff claims that the trial court incorrectly calculated the damage award by (1) failing to follow this court's directive in Gianetti II to determine first, on remand, how long the parties reasonably expected the contractual relationship to continue, (2) making inconsistent findings that the plaintiff was a lost volume seller and that he failed to prove lost profits, (3) concluding that lost profits could not be determined after 1988, even though this court in Gianetti II concluded that it would have been profitable for the plaintiff to continue working at the hospital after his privileges were terminated, (4) finding that the plaintiff suffered no lost profits after 1988 because of certain variables, even though the same variables existed prior to 1988 and the similar practices of two other plastic surgeons were profitable after 1988, (5) failing to specify the variables that prevented a determination of lost profits after 1988, (6) concluding, without *591 evidentiary support, that the increase in the number of plastic surgeons at the hospital necessarily translated to a reduced caseload available to the plaintiff after 1988, and (7) using the average market approach rather than the marginal cost approach in calculating the plaintiff's lost profits. The hospital responds that the trial court made no error in calculating the damage award. We agree with the hospital.
As explained in part I B of this opinion, "[t]he trial court has broad discretion in determining damages.... The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous.... A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed....
"We are, therefore, constrained to accord substantial deference to the fact finder on the issue of damages. In deciding whether damages properly have been awarded, however, we are guided by the well established principle that such damages must be proved with reasonable certainty.. . . Although we recognize that damages for lost profits may be difficult to prove with exactitude ... such damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty.... A damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence....
"In order to recover lost profits, therefore, the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty." (Citations omitted; internal quotation marks omitted.) Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, supra, 247 Conn. at 68-70, 717 A.2d 724.

1
The plaintiff first claims that the trial court improperly failed to follow the remand directive in Gianetti II that required it first to determine "how long the parties reasonably could have expected the contractual relationship to have continued" before calculating the amount of the damage award. Gianetti v. Norwalk Hospital, supra, 266 Conn. at 570, 833 A.2d 891. The hospital responds that the trial court properly followed the remand directive. We agree with the hospital.
In addressing the plaintiff's claim in Gianetti II that he was entitled to more than one year of damages, we stated that, "before any determination can be made with respect to the amount of damages to which the plaintiff is entitled as a result of the hospital's breach, it first must be determined how long the parties reasonably expected the contractual relationship to extend." Id., at 569, 833 A.2d 891. We subsequently noted that the record at that time contained no evidence pertaining to the parties' expectations regarding the length of the contractual relationship. Id., at 570, 833 A.2d 891. We thus concluded that "the Appellate Court improperly [had] determined that the plaintiff's damages should [have been] limited to lost profits for 1984 only"; id.; and that, on remand, "in order to determine the appropriate time period for calculating the plaintiff's lost profits, the trial court [was required to] determine how long the parties reasonably could have expected the contractual relationship to have continued. Of course, the party proving lost profits must comply with our well settled law that such damages must be proved with reasonable certainty." (Internal quotation marks omitted.) Id. Thereafter, we merely added *592 that, after the trial court had made factual findings as to whether the plaintiff was a lost volume seller, the reviewing court would be able to determine "whether the trial court's factual findings and its conclusions concerning the amount of damages to which the plaintiff is entitled are supported by the record." Id., at 571, 833 A.2d 891.
It is well settled that "[d]etermining the scope of a remand is a matter of law because it requires the trial court to undertake a legal interpretation of the higher court's mandate in light of that court's analysis. See, e.g., Higgins v. Karp, 243 Conn. 495, 502-503, 706 A.2d 1 (1998) (duty of trial court to comply with Supreme Court mandate according to its true intent and meaning ...). Because a mandate defines the trial court's authority to proceed with the case on remand, determining the scope of a remand is akin to determining subject matter jurisdiction. See, e.g., Matey v. Estate of Dember, 85 Conn.App. 198, 207, 856 A.2d 511 (2004) (Appellate Court lacks jurisdiction when Supreme Court's remand order is ignored because [there is] no final judgment pursuant to remand). We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) Hurley v. Heart Physicians, P.C., 298 Conn. 371, 383, 3 A.3d 892 (2010).
We conclude that the trial court properly interpreted and applied the remand order. As previously discussed, we made the general point in Gianetti II that the Appellate Court's conclusion that the plaintiff was entitled to no more than one year of damages was improper because it was unsupported by evidence relating to the expectations of the parties. Gianetti v. Norwalk Hospital, supra, 266 Conn. at 570, 833 A.2d 891. We then stated that, before the trial court could determine the amount of damages, it first would be necessary to determine how long the parties expected their relationship to continue. Id. Subsequently, however, we stated more specifically that, "upon remand, in order to determine the appropriate time period for calculating the plaintiff's lost profits, the trial court must also determine how long the parties reasonably could have expected the contractual relationship to have continued." (Emphasis added.) Id. We conclude that the trial court followed these instructions. Although the court did not discuss the parties' expectations until the end of its decision, it noted that this court, in remanding the case, had stated that "the trial court must also determine how long the parties reasonably could have expected the contractual relationship to have continued." (Emphasis added.) The trial court observed that other plastic surgeons who had worked with the plaintiff at Norwalk Hospital prior to 1984 had continued to maintain their privileges at the hospital for the next four years, and it could not find anything in the record indicating that the hospital also would not have continued its relationship with the plaintiff during those years. In addition, the trial court stated in its articulation that the question of the parties' expectations after 1988 was moot because damages could not be proven with reasonable certainty after that time. The fact that the trial court did not address the parties' expectations until the end of its decision and in its articulation is immaterial because it could not have calculated the damage award in the manner that it did without considering the parties' expectations and the period during which damages could be ascertained with reasonable certainty. Thus, in light of the fact that the remand language itself did not require the trial court to consider the parties' expectations in any particular sequence *593 relative to other matters, it being self-evident that their expectations were an integral part of the damage calculations, we conclude that the court properly construed the remand order because it did, in fact, make clear in its decision and articulation that it had considered the parties' expectations.

2
The plaintiff's second claim is that the trial court's conclusion that he was a lost volume seller, and by definition, profitable, is inconsistent with its conclusion that he failed to prove lost profits after 1988. The plaintiff contends that, once the trial court concluded that the plaintiff was a lost volume seller, damages should have been awarded for the entire eighteen year period following the termination of his privileges until he retired because the hospital had relinquished its right to unilaterally terminate his privileges by failing to comply with the requisite procedural standards. The plaintiff thus claims that the trial court improperly combined the issue of the period of time that the parties would have continued their relationship and the amount of lost profits to which he was entitled. The hospital responds that, in Gianetti II, this court specifically directed the trial court to determine the appropriate period of time for calculating the plaintiff's lost profits by examining the parties' reasonable expectations; see Gianetti v. Norwalk Hospital, supra, 266 Conn. at 570, 833 A.2d 891; and that the hospital did not forfeit its right to challenge the plaintiff's reappointment until the plaintiff no longer desired to be reappointed. The hospital also argues that the plaintiff ignores the effect of the variables that the trial court discussed in concluding that he had failed to prove with reasonable certainty the amount of profits that he would have lost after 1988. We agree with the hospital.
To the extent that the plaintiff argues that he should have been awarded damages for eighteen years following the termination of his privileges because only his expectations, and not those of the hospital, were relevant, he relies on the following language in Gianetti II: "On the basis of our review of the bylaws ... the plaintiff had a right to reappointment until the governing authorities determined after a hearing conforming to the minimum requirements of procedural due process that he did not meet the reasonable standards of the hospital.... The fact that review of this appointment is made mandatory on an annual ... basis ... can by no means be said to render it probationary or tentative in effect." (Citation omitted; internal quotation marks omitted.) Id., at 568-69, 833 A.2d 891. The plaintiff, however, ignores the language that directly follows this passage, in which the court explained: "Our review of the bylaws does not completely resolve the present issue.... As this court already has concluded in an earlier decision in this matter, the [hospital's] ... bylaws, by themselves, do not constitute an enforceable contract between th[e] hospital and the plaintiff; Gianetti v. Norwalk Hospital, supra, 211 Conn. at 59 [557 A.2d 1249]; but, rather, form an integral part of the contractual relationship.... Id., at 64 [557 A.2d 1249]. Before we can properly review the rights and duties arising out of this contractual relationship, it is essential to determine [t]he intention of the parties manifested by their words and acts.... Thus, before any determination can be made with respect to the amount of damages to which the plaintiff is entitled as a result of the hospital's breach, it first must be determined how long the parties reasonably expected the contractual relationship to extend." (Citations omitted; internal quotation marks omitted.) Gianetti v. Norwalk Hospital, supra, 266 Conn. *594 at 569, 833 A.2d 891. Accordingly, the trial court properly considered both parties' reasonable expectations in determining how long the relationship could be expected to continue.
As for the plaintiff's claim that he should have been awarded damages for eighteen years, the trial court found that, because the plaintiff had failed to prove lost profits beyond the year 1988, the issue of the parties' intentions to continue their relationship after that time was moot. The trial court explained that variables affecting the plaintiff's potential earnings at the hospital after 1988 to the time of his retirement were "so substantial, that any finding of lost profits for those years would be based on surmise and conjecture." The plaintiff has cited no evidence that contradicts this finding. We therefore conclude that there is no inconsistency between the trial court's finding that the plaintiff was a lost volume seller and its finding that lost profits should be awarded only for the years 1984 through 1988.

3
The plaintiff's third claim is that the trial court improperly concluded that lost profits could not be determined after 1988 in light of this court's ruling in Gianetti II, under the second prong of the lost volume seller test, that it would have been profitable for the plaintiff to continue working at Norwalk Hospital after that year. The hospital replies that the trial court did not conclude that lost profits could not be determined after 1988 but that the plaintiff had failed to present sufficiently accurate and complete evidence to estimate profits for those years with reasonable certainty. We determine that the plaintiff's claim has no merit.
The plaintiff is operating under two misconceptions. First, the trial court did not rule that lost profits could not be determined after 1988 but, rather, that the plaintiff had not sustained his burden of proving lost profits after 1988. Second, the plaintiff's claim is based on a misunderstanding of Gianetti II. We did not conclude that it would have been profitable for the plaintiff to remain at the hospital for all eighteen years following the termination of his privileges until he retired. Rather, we stated that, in determining whether the plaintiff could be a lost volume seller "the relevant inquiry under the profitability prong is whether the plaintiff could have performed under the contract with the hospital and assumed the increased workload at the other hospitals the year after the breach without having incurred additional costs that would have eliminated the profitability of such an increased workload." (Emphasis added.) Gianetti v. Norwalk Hospital, supra, 266 Conn. at 563 n. 10, 833 A.2d 891. Thus, our statement that "the record supports the Appellate Court's conclusion that it would have been profitable for the plaintiff to perform under the contract with the hospital while assuming an increased workload at the other hospitals"; id., at 563-64 n. 10, 833 A.2d 891; referred to the year following the termination of his privileges, and we made no comment as to how long after that time it would have been profitable for the plaintiff to continue working at the hospital. Indeed, we expressly directed the trial court, on remand, to determine damages and to make factual findings and conclusions concerning "the appropriate time period for calculating the plaintiff's lost profits ... [and] how long the parties reasonably could have expected the contractual relationship to have continued." Id., at 570, 833 A.2d 891. We therefore reject the plaintiff's claim that our reasoning in Gianetti II cannot be reconciled with the trial court's conclusion *595 that lost profits could not be determined with reasonable certainty after 1988.

4
The plaintiff's fourth and fifth claims, which we consider together because of their similarity, are that (a) the trial court improperly concluded that the plaintiff suffered no lost profits after 1988 because the effect of certain variables on his projected income, on which the trial court relied, also existed prior to 1988, and two plastic surgeons with similar practices earned profits after 1988, and (b) there was insufficient evidence in the record to support the trial court's conclusion that the effect of the variables after 1988 was so problematic that the trial court could not have determined lost profits between 1988 and the year that the plaintiff retired. The hospital responds that the trial court's conclusions were supported by sufficient evidence. We agree with the hospital.
Before we address these claims, we reexamine the trial court's reasoning. The trial court concluded that damages could be calculated with reasonable certainty from 1984 through 1988 because the evidence established that the effect of the variables on the plaintiff's earnings during those years was reasonably similar to their effect on his earnings prior to 1984. In support of its conclusion, the trial court observed that there were three to four plastic surgeons on call at Norwalk Hospital from 1978 through 1982, including the plaintiff, and that there were three plastic surgeons on call in 1984 and 1985, four in 1986 and 1987, and six in 1988. The court thus accepted the plaintiff's estimate, despite the slight increase in the number of on-call plastic surgeons at the hospital after 1984, that he would have performed at least eighty-eight emergency room procedures each year from 1984 through 1988, which was the median number of procedures that he had performed each year from 1978 through 1982. The court was not willing, however, to accept the plaintiff's estimate of procedures for the years after 1988 because there were more plastic surgeons on call at the hospital during that time, and the plaintiff testified that he had handled fewer cases because of the variables cited by the court, which was reflected in evidence that the number of cases that he handled at the Bridgeport hospitals had declined steadily over the following ten years. The trial court ultimately concluded that, because there was insufficient evidence as to the effect of these and other variables after 1988, it was unable to project lost profits with reasonable certainty.
We first note that the plaintiff's claim that two other plastic surgeons had profitable practices after 1988 is irrelevant in considering the propriety of the trial court's calculation of the damage award because it has no bearing on whether there was sufficient evidence in the record to determine the amount of profits that the plaintiff would have lost under the circumstances of this case. In other words, even if the trial court had concluded that the plaintiff might have earned profits from his work at Norwalk Hospital after 1988, that conclusion sheds no light on the question of exactly what those profits would have been, which would have required more detailed evidence than the plaintiff presented. We therefore consider each of the variables that the trial court listed to determine whether there was sufficient evidence to support its conclusion that lost profits after 1988 could not be calculated with reasonable certainty.
With respect to the first variable, the number of emergency room plastic surgery procedures after 1988, Joel B. Singer, a plastic surgeon, testified that there had "definitely" been a downward trend in the number of emergency room procedures *596 since the early 1990s. Calabrese, another plastic surgeon, similarly testified that the number of calls to the emergency room in 1996 and 1997 had "drastically decreased." In addition, the plaintiff submitted an exhibit showing that the number of cases that he handled in the Bridgeport hospitals had dropped significantly from 1989 to 1999, a trend that the trial court could have extrapolated to the number of Norwalk cases that he might have handled during those years.[19] The evidence was therefore sufficient to support the trial court's conclusion that the number of cases handled by on-call plastic surgeons after 1988 steadily declined over the next ten years, and, as a result, the plaintiff's workload at Norwalk Hospital could not be determined with sufficient accuracy during that period.
With respect to the second variable, the number of plastic surgeons on rotation at Norwalk Hospital to cover its emergency room needs, the evidence established that the number of plastic surgeons increased slightly from 1984 to 1988, and then more significantly in the years that followed.[20] See footnote 15 of this opinion. Both Singer and Calabrese testified that the emergency room schedule for plastic surgeons was rotational and that the number of days of emergency room call was divided equally among the number of plastic surgeons who were available so that each surgeon would be assigned the same number of days. On the basis of this evidence, the trial court reasonably could have concluded that the increase in the number of on-call plastic surgeons at Norwalk Hospital might have resulted in a decrease in the number of cases performed by each surgeon, a fact that the plaintiff himself acknowledged,[21] thus making it difficult to determine his workload at the hospital after 1988.
With respect to the third variable, the number of plastic surgery procedures performed by emergency room physicians other than plastic surgeons, Singer and Calabrese testified that, in the 1990s, emergency room physicians began to handle certain procedures that were previously handled by plastic surgeons, which would have resulted in a decrease in the number of emergency room procedures that on-call surgeons were asked to perform. The plaintiff similarly testified that the declining number of plastic surgery cases he handled in the Bridgeport hospitals in the 1990s may have been due to the fact that "doctors in the emergency room [were] doing more of the kind of procedures that ... plastic surgeons used to *597 do...." Accordingly, the evidence supported the trial court's finding that any calculation of lost profits after 1988 would be based on "surmise and conjecture."
With respect to the fourth variable, the diminution in the number of injuries requiring plastic surgery due to increased use of seat belts and air bags, Singer testified directly to that effect, and the trial court was entitled, as the finder of fact, to credit Singer's testimony. Similarly, the trial court was entitled to credit testimony regarding the fifth, sixth and seventh variables, respectively, that there had been a reduction in fees paid for plastic surgery procedures by health insurance companies,[22] that a number of uninsured patients did not pay for their treatment,[23] and that medical fees had risen due to cost-of-living adjustments, in ruling that the "cumulative" effect of the seven variables beyond 1988 was "so substantial" that "any finding of lost profits for those years would be based on surmise and conjecture." Accordingly, there is no merit to the plaintiff's claim that there was insufficient evidence to support the trial court's conclusion that it could not calculate lost profits after 1988 with reasonable certainty.

5
The plaintiff's next claim is that the trial court's conclusion that it could not assess the plaintiff's lost profits after 1988 was based on an improper assumption that the increase in the number of on-call plastic surgeons at the hospital during that time necessarily translated to fewer cases per plastic surgeon and a reduced caseload available to the plaintiff, when there was no evidence to support that conclusion. The hospital responds that the court properly concluded that the increase in the number of plastic surgeons with privileges at Norwalk Hospital resulted in a reduction in the number of cases available to each on-call plastic surgeon. The plaintiff's claim has no merit.
The plaintiff misstates the trial court's reasoning and conclusion. Although the trial court discussed evidence regarding the number of plastic surgeons on call at the hospital from 1978 through 1995, which increased significantly after 1987, the court made no direct connections between the growing number of surgeons and a reduction in their caseload but merely stated that "[t]he cumulative variables for the years 1989 and beyond [were] so substantial, that any finding of lost profits for those years would be based on surmise and conjecture." The number of plastic surgeons was only one of those variables. Other variables that would have affected the plaintiff's workload included the number of plastic surgery procedures required by the hospital's emergency room patients, the number of plastic surgery procedures performed by emergency room physicians other than plastic surgeons, and the diminution in injuries requiring plastic surgery due to the increased use of seat belts and air bags. Accordingly, we conclude that the plaintiff's claim has no merit.

6
The plaintiff's final claim is that the trial court, in its calculation of lost profits, improperly relied on the average market *598 approach instead of the marginal cost approach in estimating the expenses associated with his Westport office for the years 1984 through 1988. The hospital responds that the trial court properly used the average market approach in estimating these expenses. We agree with the hospital.
The following additional facts are relevant to our resolution of this issue. At trial, two certified public accountants provided expert testimony on the proper methodology for estimating the expenses associated with the plaintiff's Westport office for the years 1984 through 1988, which were deducted from the plaintiff's gross earnings to determine lost profits. The hospital's expert, John Allen Kosowsky, recommended the "average market approach." Under that approach, Kosowsky calculated the plaintiff's net income by examining the plaintiff's income tax returns and identifying the actual operating expenses for his Bridgeport practice during the years 1984 through 1988, and then applying the same ratio of expenses to gross income to the plaintiff's projected gross income from his Norwalk practice for each of those years. Kosowsky stated that he had used this approach because Connecticut law does not differentiate between separate offices and requires that all expenses be lumped together in a single category.
The plaintiff's expert, Christopher A. Gallo, recommended the marginal cost approach, under which he had examined each line item of expenses on the plaintiff's income tax returns for the years 1980 through 1983, which did not differentiate between his Bridgeport and Westport offices,[24] and identified the expenses relating to the operation of his Westport office. Gallo determined the amounts to be deducted by discussing each line item with the plaintiff, asking him to identify the expenses relating to his Norwalk practice and deciding whether the plaintiff's estimate seemed reasonable. Gallo then calculated the operating expenses as a percentage of the plaintiff's gross income for the years 1980, 1981 and 1982, and averaged those percentages to arrive at a ratio of expenses to gross income of 11.41 percent over the three years. He thus computed the plaintiff's projected net income from the Norwalk practice by deducting 11.41 percent from his projected gross income for the years 1984 through 1988. Gallo explained that the marginal cost approach was intended to identify the expenses that would disappear after the plaintiff's Norwalk practice was closed, and that a determination of "what [the plaintiff's] profitability was in the Norwalk practice under the tax rules" was a "different... assignment." Gallo repeated on cross-examination that his numbers were based on estimates that he had made following discussions with the plaintiff and not on invoices or detailed records such as telephone bills or checks, and that he believed that the plaintiff's information was accurate.
Thereafter, the trial court adopted, in part, one of several alternative formulas provided by the plaintiff for the purpose of calculating his lost profits. Pursuant to that formula, the court determined that the plaintiff's yearly lost[25] gross income would have been $74,785 in 1984, $79,477 in 1985, $85,428 in 1986, $91,100 in 1987 and $97,052 in 1988. The court next calculated the plaintiff's net profit by following the average market approach and examining *599 his income tax returns for the years 1984 through 1988. After determining that the ratio of expenses to gross income from the plaintiff's Bridgeport practice was 33.3 percent in 1984, 43.54 percent in 1985, 44.82 percent in 1986, 37.55 percent in 1987 and 38.36 percent in 1988, the court applied the same ratios to the plaintiff's anticipated gross income from his Norwalk practice, which resulted in a reduction in the plaintiff's earnings of $24,903 in 1984, $34,604 in 1985, $38,288 in 1986, $34,208 in 1987 and $37,229 in 1988.
In his motion for articulation, the plaintiff asked the court to explain its decision to use the average market approach instead of the marginal cost approach in calculating his lost profits. The plaintiff argued that courts generally do not include fixed costs in the calculation of lost profits and that the trial court's reasons for departing from the established rule should be articulated. The trial court responded that "[t]he use of `average costs' rather than `marginal costs' in computing lost profits was justified by the requirement that the plaintiff had to maintain a separate office in Westport to qualify as a staff physician in Norwalk. Based on that requirement, this court determined that `average costs' were the appropriate costs in computing net profit."
Comment (f) to § 347 of the Restatement (Second) of Contracts provides that the injured party's damages in lost volume seller cases are "based on the net profit that he has lost as a result of the broken contract." 3 Restatement (Second), supra, at § 347, comment (f), p. 117; see also id., illus. 16, p. 117.[26] Subsection (2) of § 2-708 of the Uniform Commercial Code, which "embodies the lost volume seller theory in the context of contracts for the sale of goods"; Gianetti v. Norwalk Hospital, supra, 266 Conn. at 553 n. 6, 833 A.2d 891; similarly provides: "If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." Uniform Commercial Code § 2-708(2), 1C U.L.A. 78 (2004); see also 22 Am.Jur.2d 407-408, Damages § 458 (2003) ("the expenses saved because of the wrongful act... must be subtracted from any recovery").
With respect to the calculation of lost profits, "`net profit' is the gross amount that would have been received, less the cost of running the business. What does or does not have to be deducted to reach a net lost profit figure may vary." 22 Am.Jur.2d 409, supra, at § 458. "[Lost profits may be] ascertained by deducting from the contract price those expenses necessary for completing performance.... It is ... not proper to base the profits lost on the work not completed on the profit margin realized on the work that was completed; it is necessary to provide proof on the projected cost of the uncompleted work." Id., at § 459, pp. 409-10. "Profit margin (or the percentage of sales income remaining after the payment *600 of costs) can [also] result in an accurate estimate of lost net profits, but only if the formula used to determine the profit margin properly takes into account the costs that would have been incurred if there had been no breach...." Id., at § 458, p. 409. "A claim for lost profits based on an assertion that the nonbreaching party makes a certain percentage of the sale price as profit must be supported by some evidence showing how the clamant arrived at this percentage profit factor, or the claim for lost profits can be dismissed, even though it is established that the contract was breached." Id., at § 459, p. 410.
In the present case, the trial court chose to follow the average market approach, which was advocated by the hospital's expert, Kosowsky. The court thus examined the plaintiff's income tax returns for the years 1984 through 1988 to determine the ratio of expenses to gross income from his Bridgeport practice and applied the same ratio to the plaintiff's projected gross income from his Norwalk practice. The calculation was based on the same income tax returns that Kosowsky consulted, which contain detailed information regarding the plaintiff's expenses that the plaintiff had entered into evidence for each of those years. Because any determination of the plaintiff's net profits would have been based on an estimate of his expenses regardless of the approach employed, we conclude that there was sufficient evidence in the record to support the trial court's conclusion that the expected gross income from his Norwalk practice would have been reduced by the same percentage of expenses as the gross income from his Bridgeport practice.
The plaintiff relies on Kutner Buick, Inc. v. American Motors Corp., 868 F.2d 614 (3d Cir.1989), in arguing that the trial court should have used the marginal cost approach for calculating his projected expenses. He contends that the expenses listed on his income tax returns were primarily fixed costs that were not likely to change significantly by continuing, or not continuing, to work at Norwalk Hospital, and that the trial court should have identified only those "extra" expenses that he would have incurred if he had continued to work at the hospital, which were modest in comparison to the tax return cost data and which Gallo testified were, on average, 11.41 percent of his expected gross income. We disagree.
In Kutner Buick, Inc., the plaintiff, a retail distributor of automobiles, owned a facility in which it conducted at least two separate business activities: the sale of products from American Motors Corporation (American Motors) and the sale of Buicks for General Motors Corporation. Id., at 615-17. When American Motors contracted with another dealer to sell its products in the same area, the plaintiff terminated its relationship with American Motors and sought damages for breach of contract. See id., at 616. The Third Circuit Court of Appeals determined that the District Court improperly had rejected the theory offered by the plaintiff's expert that, with respect to the computation of net lost profits from the termination of the sale of American Motors products, fixed costs for the facility should be disregarded. Id., at 617-18. The court stated: "The effect on net income must be measured by revenue lost less costs avoided. This translates into lost revenue less the variable cost of producing this lost revenue. Fixed or unavoidable costs are by definition unrelated to the individual income producing activity and thus are not relevant to the change in net profit calculation....
"Fixed costs remain the same over a relevant range of activity for a given time *601 period; whereas, variable costs change in total in relation to changes in total activity. . . . Whether a cost is fixed or variable depends upon and may change with the specific inquiry. For example, if at a business facility, a single activity was being conducted, all costs, whether denominated as fixed or as variable for financial reporting purposes, should be taken into account in determining the effect on net profit of the termination of that activity. Under these circumstances, all costs would eventually be variable because at some point after all activity ceases all costs would cease. If at a business facility more than one activity was being conducted, however, in calculating the effect on net profit from terminating one of them, fixed overhead costs would be irrelevant." (Citations omitted.) Id., at 618.
Kutner Buick, Inc., is inapplicable to the present context because it is factually distinguishable. In that case, the issue of net profits was discussed in the context of a business that conducted more than one activity at a single business facility. See id., at 617. In contrast, the plaintiff in the present case operated out of two separate facilities, one in Bridgeport to serve his Bridgeport practice and one in Westport to serve his Norwalk practice. Thus, the court was presented with the entirely different question of how to calculate expenses associated with an independent business facility. The plaintiff introduced his income tax returns to establish his gross income and expenses for the years 1978 through 1997, but the expenses were not allocated between his Westport and Bridgeport offices. Consequently, while there may have been some differences between the costs arising from the plaintiff's operations in the two locations, the trial court determined that the better approach would be the one recommended by Kosowsky, and it thus used the ratio of expenses to gross income in the plaintiff's Bridgeport office to calculate the expenses that he would have incurred in connection with his Norwalk practice for each of the years in question. Although Gallo introduced evidence relating to the ratio of expenses to gross income from the plaintiff's Norwalk practice for the three years preceding 1984 that he claimed provided a more accurate basis for estimating the plaintiff's expenses, the trial court apparently did not find his testimony as credible as Kosowsky's, perhaps in part because Gallo admitted on cross-examination that his estimate of expenses for the Westport office was not based on detailed records, receipts or other documentation but on the plaintiff's unsupported statements and assurances. Accordingly, we conclude that the trial court properly relied on the average market approach instead of the marginal cost approach in calculating the plaintiff's lost profits for the years 1984 through 1988.

B

Interest
The plaintiff's next claim is that the trial court improperly declined to award prejudgment and postjudgment interest. The plaintiff argues that he should be awarded prejudgment interest from 1984 to 1987 because the hospital breached its contractual relationship with the plaintiff at the end of 1983. The plaintiff also argues that he should be awarded postjudgment interest from 1987 to the present because the court concluded in 1987 that an enforceable contractual relationship existed between the parties and that the hospital had breached that relationship by failing to follow the procedural requirements of its bylaws when it declined to renew the plaintiff's privileges. The hospital responds that the trial court correctly followed the law and acted within its discretion *602 in denying the plaintiff's request for prejudgment and postjudgment interest because the dispute is over the amount of damages due, and the trial court did not determine that the plaintiff was a lost volume seller until 2009. See, e.g., Travelers Property & Casualty Co. v. Christie, 99 Conn.App. 747, 766, 916 A.2d 114 (2007). We agree with the hospital.
Before addressing this claim, we briefly review the relevant facts. The plaintiff filed a complaint against the hospital in January, 1984. On May 4, 1987, the attorney trial referee concluded in his report to the trial court that the hospital had breached "an enforceable contract" with the plaintiff. After this court in Gianetti I determined that there was a contractual relationship between the parties and that it was enforceable; see Gianetti v. Norwalk Hospital, supra, 211 Conn. 63, 66, 557 A.2d 1249; the trial court accepted the attorney trial referee's report on June 17, 1993, rendered judgment in favor of the plaintiff on the issue of liability only and referred the matter for a hearing in damages. A hearing was subsequently held, and, on September 9, 1999, the trial court awarded the plaintiff $1 as nominal damages, explaining that he was not a lost volume seller and, therefore, that the doctrine of mitigation of damages applied. The plaintiff appealed to the Appellate Court from that part of the judgment awarding nominal damages, and the Appellate Court reversed the judgment in 2001 on the ground that the lost volume seller theory can apply to personal service contracts and that the trial court should have deemed the plaintiff a lost volume seller and awarded him damages for lost profits for 1984 only. See Gianetti v. Norwalk Hospital, supra, 64 Conn.App. 229-31, 233, 779 A.2d 847. The hospital appealed from that judgment to this court in Gianetti II, in which we concluded in 2003 that the record at that time contained insufficient evidence to determine whether the plaintiff was a lost volume seller under the circumstances of this case and remanded the case to the trial court for an evidentiary hearing to determine whether the plaintiff was a lost volume seller and, if so, his damage award. Gianetti v. Norwalk Hospital, supra, 266 Conn. at 561, 563, 571, 833 A.2d 891. On remand, the trial court concluded in its memorandum of decision dated April 15, 2009, and its articulation dated November 19, 2009, that the plaintiff was a lost volume seller and awarded him damages for the years 1984 through 1988. It is the plaintiff's appeal from the trial court's decision that is now before this court.
The plaintiff did not seek prejudgment and postjudgment interest until he sought permission to file a second amended complaint dated May 15, 2008.[27] At that time, the plaintiff argued that, because a judgment had been rendered in 1987, postjudgment interest from 1987 to the present automatically should be included in the court's assessment of damages. The plaintiff also argued that he was entitled to an award of prejudgment interest under General Statutes § 37-3a[28] from 1984 through 1987.
*603 Discussing the issue of interest in its memorandum of decision dated April 15, 2009, the trial court noted that prejudgment interest is allowed and may be recovered under § 37-3a as damages for the detention of money after it becomes payable. It also cited case law indicating that such interest is primarily an equitable determination within the discretion of the trial court; see Westport Taxi Service, Inc. v. Westport Transit District, supra, 235 Conn. at 41, 664 A.2d 719; and that the focus of a prejudgment interest award under § 37-3a is to provide interest at the discretion of the court when there is no dispute over the sum due and the liable party has without justification refused to pay. Travelers Property & Casualty Co. v. Christie, supra, 99 Conn.App. at 765, 916 A.2d 114. The trial court then concluded: "The defendant made a good faith claim that the plaintiff was not a lost volume seller and thereby was required to mitigate his damages. [The] court finds that the defendant was justified in refusing to pay plaintiff's claimed damages prior to the resolution of the issue of whether the plaintiff was a lost volume seller. The [p]laintiff's claim for prejudgment interest is therefore denied."
Both parties filed motions for articulation,[29] with the plaintiff specifically requesting the court to address the issue of postjudgment interest, which it had failed to do in its decision. The court responded that it "ha[d] articulated in its decision its rationale by which the date of the running of interest would commence."
We begin with General Statutes § 37-3a, which provides in relevant part: "(a) Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed [with certain exceptions] in civil actions or arbitration proceedings under chapter 909 . . . as damages for the detention of money after it becomes payable. . . ."
We recently considered a similar claim for prejudgment and postjudgment interest in MedValUSA Health Programs, Inc. v. MemberWorks, Inc., 273 Conn. 634, 636, 872 A.2d 423, cert. denied sub nom. Vertrue, Inc. v. MedValUSA Health Programs, Inc., 546 U.S. 960, 126 S.Ct. 479, 163 L.Ed.2d 363 (2005), in which the trial court confirmed an arbitration award in favor of the plaintiff and awarded $5 million in punitive damages but declined to award the plaintiff prejudgment and postjudgment interest. The plaintiff had argued that the purpose of arbitration is the speedy resolution of disputes and that the deference generally accorded a trial court's determination regarding prejudgment and postjudgment interest should not be granted in the context of an arbitration award. Id., at 666, 872 A.2d 423. The trial court rejected this claim, however, on the ground that the defendant's arguments in support of its motion to vacate the arbitration award had not been frivolous. Id. On appeal, this court stated that "[t]he decision of whether to grant interest under § 37-3a is primarily an equitable determination and a matter lying within the discretion of the trial court. . . . In determining whether the trial court has abused its discretion, we must make every reasonable presumption in favor of the correctness of its action. . . . The court's determination regarding the award of interest should be made in view of the demands of justice rather than through the application of any arbitrary rule. . . . Whether interest may be awarded depends on whether the money *604 involved is payable . . . and whether the detention of the money is or is not wrongful under the circumstances. . . .
"The trial court cited as its primary reason for denying the plaintiff's motion for interest pursuant to § 37-3a that the defendant had not wrongfully withheld the money because its arguments in opposition to the application to confirm the award and in support of its motion to vacate the award were not frivolous. This was an appropriate equitable consideration within the discretion of the trial court. The trial court's decision, therefore, was not an abuse of discretion." (Citations omitted; internal quotation marks omitted.) Id.
The same reasoning applies to the plaintiff's claim for prejudgment and postjudgment interest in the present case. Although the attorney trial referee concluded in his 1987 report that "an enforceable contract" existed between the hospital and the plaintiff, the trial court did not render judgment for the plaintiff on the issue of liability until 1993, following this court's determination in 1989 that there was an enforceable contractual relationship between the plaintiff and the hospital. See Gianetti v. Norwalk Hospital, supra, 211 Conn. at 63, 66, 557 A.2d 1249. Moreover, the trial court deemed the judgment as to liability "interlocutory," leaving the determination of damages to a future hearing. The issue of whether the plaintiff was a lost volume seller was not decided by the trial court until 2009, and that decision is the subject of the present appeal. If this court had concluded that the plaintiff was not a lost volume seller, the hospital very likely would not have been required to pay damages because the plaintiff earned a higher gross income in 1984 than he had earned in any previous year. Like the defendant in MedValUSA Health Programs, Inc., the hospital made good faith arguments as to liability and damages throughout the litigation, and the parties did not know if the plaintiff would receive a damage award until the trial court determined in 2009 that the plaintiff was a lost volume seller. Accordingly, we conclude that the trial court did not abuse its discretion in declining to award the plaintiff prejudgment and post-judgment interest.

C

Attorney's Fees
The plaintiff next claims that the trial court improperly declined to award him attorney's fees. He claims that he should have been awarded attorney's fees because the hospital acted in bad faith in choosing to continue the litigation for twenty-eight years instead of reinstating the plaintiff's privileges or providing him with the due process hearing to which he was entitled. He also claims that he should be awarded attorney's fees because the hospital owed him a fiduciary duty to follow its bylaws and to provide him with a hearing before terminating his privileges, and that it breached this duty when it failed to do so. The hospital responds that both arguments are inapplicable because it did not act in bad faith and the violation at issue involved a breach of duty arising out of a contractual relationship, not a breach of fiduciary duty. We agree with the hospital.
"It is well established that we review the trial court's decision to award attorney's fees for abuse of discretion. . . . This standard applies to the amount of fees awarded . . . and also to the trial court's determination of the factual predicate justifying the award. . . . Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review *605 of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) Simms v. Chaisson, 277 Conn. 319, 325, 890 A.2d 548 (2006).
The following additional facts are relevant to our resolution of this issue. In his original complaint, the plaintiff sought reasonable attorney's fees only with respect to his request for injunctive relief. After the request for injunctive relief was denied in 1999 and the denial was upheld by this court in 2003; Gianetti v. Norwalk Hospital, supra, 266 Conn. at 571, 833 A.2d 891; the plaintiff sought leave to file an amended complaint on August 1, 2007, to include an award of attorney's fees on the ground that the prolonged nature of the litigation, which had been ongoing for more than twenty-eight years, and the failure of the hospital to restore his privileges or grant him the required hearing, constituted evidence that the hospital had "acted in bad faith, vexatiously, wantonly, or for oppressive reasons. . . ." (Internal quotation marks omitted.) In a second request to file an amended complaint dated May 15, 2008, the plaintiff again sought, inter alia, attorney's fees, adding allegations that the hospital had breached its fiduciary duty in failing to comply with its bylaws when it terminated his privileges. The trial court did not respond to either of the plaintiff's requests to file an amended complaint. The court nonetheless addressed his claim for attorney's fees in its decision. Perhaps because it had considered and rejected the bad faith claim in the context of the plaintiff's request for prejudgment and postjudgment interest, the court did not consider that claim again in connection with his request for attorney's fees but, rather, only considered whether the hospital had breached a fiduciary duty "relating to the staffing and running of hospitals." The court ultimately denied the claim on the ground that "[t]he concept may be related to the patients of these health [care] providers who implicitly rely on a beneficial relationship with a health [care] provider, but [the] court is not persuaded that it extends to health [care] providers on staff." Thereafter, the plaintiff requested in his motion for articulation that the trial court further explain "the basis of [its] conclusion that . . . the `fiduciary concept' does not extend to health care providers," thereby precluding an award of attorney's fees. The court responded that the case law that the plaintiff cited concerning fiduciary duty did "not equate `fiduciary duty' with `fiduciary concept'" and that it was not "persuaded that such an equation should be drawn."
Insofar as the plaintiff alleges that the hospital acted in bad faith by extending the litigation and failing to restore his privileges or to grant him a hearing, we stated in Maris v. McGrath, 269 Conn. 834, 850 A.2d 133 (2004), that, "[a]s a substantive matter, [t]his state follows the general rule that, except as provided by statute or in certain defined exceptional circumstances, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser. . . . That rule does not apply, however, where the opposing party has acted in bad faith. . . . It is generally accepted that the court has the inherent authority to assess attorney's fees when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons. . . . This bad faith exception applies, not only to the filing of an action, but also in the conduct of the litigation. . . . It applies both to the party and his counsel. . . . Moreover, the trial court must make a specific finding as to whether counsel's [or a party's] conduct . . . constituted or was tantamount to bad *606 faith, a finding that would have to precede any sanction under the court's inherent powers to impose attorney's fees for engaging in bad faith litigation practices." (Citations omitted; internal quotation marks omitted.) Id., at 844-45, 850 A.2d 133.
We reject the plaintiff's claim, for the reasons cited in our discussion of prejudgment and postjudgment interest in part II B of this opinion. The hospital's liability was not finally established until 1993, and the issue of whether the plaintiff was entitled to damages could not be resolved until the trial court determined whether he was a lost volume seller, which the court was unable to do because of continuing litigation until 2009. Moreover, the trial court specifically found that the hospital had not acted in bad faith when it considered the plaintiff's bad faith argument in the context of his request for prejudgment and postjudgment interest.[30]
We also reject the plaintiff's claim that he should be awarded attorney's fees on the ground that the hospital breached its fiduciary duty to comply with its bylaws when it failed to hold the required hearing on the revocation of the plaintiff's privileges. The plaintiff relies on Owens v. New Britain General Hospital, 229 Conn. 592, 643 A.2d 233 (1994), in support of this claim. In Owens, we considered the proper test for determining whether a hospital had complied with its bylaws in terminating a physician's medical staff privileges; id., at 593, 643 A.2d 233; and concluded that "a substantial compliance test . . . is the proper test by which to measure whether a hospital has sufficiently complied with its bylaws in terminating a physician's medical staff privileges" because of the "overarching function that medical staff bylaws are designed to servethe provision of quality medical care to the surrounding public community. . . . Medical staff bylaws reflect what the medical community considers to be crucial to the effective administration of the hospital and the provision of quality medical care by physicians whose performance has earned them privileges. At the same time, the procedural protocol of the bylaws provide, outside of the judicial system, a fair method for making decisions concerning staff privileges." (Citation omitted; internal quotation marks omitted.) Id., at 604, 643 A.2d 233. We added that "the obligation to follow medical staff bylaws is paramount and that a hospital must afford its medical staff all the process and protections encompassed by its bylaws"; id.; because that obligation "can stem from a contractual relationship between the hospital and the physician," "a preexisting legal duty imposed by our state department of health regulations," "the recognition of a `fiduciary concept,'" or "the public's substantial interest in the operation of hospitals, public or private." (Emphasis added.) Id., at 605, 643 A.2d 233.
It is clear from this passage that our reference to a "`fiduciary concept'" in Owens was intended to describe the relationship of a hospital to the surrounding community, not to a physician. This is supported by our citation, immediately following the "fiduciary concept" language, to *607 Greisman v. Newcomb Hospital, 40 N.J. 389, 192 A.2d 817 (1963), for the proposition that hospital officials "must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such." Id., at 404, 192 A.2d 817; accord Owens v. New Britain General Hospital, supra, 229 Conn. at 605, 643 A.2d 233. The court in Greisman had explained that such powers must be exercised "in furtherance of the common good"; Greisman v. Newcomb Hospital, supra, at 404, 192 A.2d 817; and that, "while the managing officials [of private hospitals] may have discretionary powers in the selection of the medical staff, those powers are deeply embedded in public aspects, and are rightly viewed, for policy reasons . . . as fiduciary powers to be exercised reasonably and for the public good." Id., at 402, 192 A.2d 817. Thus, neither Greisman nor Owens recognized the existence of a fiduciary duty of a hospital to a physician, and we reject the plaintiff's claim that he was entitled to attorney's fees on that ground.
The judgment is affirmed.
In this opinion the other justices concurred.
NOTES
[1] We first considered the issues in this case in Gianetti v. Norwalk Hospital, 211 Conn. 51, 557 A.2d 1249 (1989)(Gianetti I), and, again, in Gianetti v. Norwalk Hospital, 266 Conn. 544, 833 A.2d 891 (2003) (Gianetti II).
[2] We hereinafter refer to the defendant, Norwalk Hospital, as either Norwalk Hospital or the hospital.
[3] The hospital and the plaintiff appealed to the Appellate Court, and we transferred the appeals to this court pursuant to General Statutes § 51-199(c) and Practice Book § 65-1.
[4] The plaintiff specifically claims that the trial court improperly (1) failed to follow our directive in Gianetti v. Norwalk Hospital, 266 Conn. 544, 570, 833 A.2d 891 (2003) (Gianetti II), requiring the court first to determine how long the parties reasonably expected the contractual relationship to continue before calculating the amount of the damage award, (2) made inconsistent findings that the plaintiff was a lost volume seller and that the plaintiff had failed to prove lost profits after 1988, (3) concluded that lost profits could not be determined after 1988, even though this court affirmed in Gianetti II that it would have been profitable for the plaintiff to continue working at Norwalk Hospital after 1988; see id., at 563-64 n. 10, 833 A.2d 891; (4) concluded that the plaintiff had suffered no lost profits after 1988 because of certain variables, when the same variables had existed prior to 1988 and two other plastic surgeons with similar practices earned profits after 1988, (5) failed to specify the variables that prevented it from calculating lost profits after 1988, (6) concluded that the increase in the number of plastic surgeons at Norwalk Hospital after 1988 necessarily would have translated to a reduced caseload for the plaintiff when there was no evidence presented to support that conclusion, and (7) failed to consider as expenses for the purpose of calculating the plaintiff's lost profits only those additional costs incurred by virtue of the plaintiff's service as an emergency room physician at Norwalk Hospital.
[5] The plaintiff also claims that the trial court failed to rule on the liability of the seven individual defendants, namely, Norman A. Brady, the former president of Norwalk Hospital, and physicians William F. Hughes, Horace A. Laffaye, the former chairman of the department of surgery, E.J. Tracey, the former chief of staff, Joel B. Singer, the former chief of the plastic and reconstructive surgery section, Carmine Calabrese, and Philip F. Corso. During oral argument, however, the plaintiff's appellate counsel stipulated that the action should be withdrawn as to all of the individual defendants.
[6] The trial court accepted the attorney trial referee's report only after this court determined, with respect to two questions of law that the parties had presented for appellate review by way of a joint motion for reservation, that (1) the hospital bylaws did not create a contract between the plaintiff and the hospital but that there was nonetheless a contractual relationship between them, and (2) the rights and duties arising out of the contractual relationship were subject to judicial review. See Gianetti v. Norwalk Hospital, 211 Conn. 51, 63-64, 557 A.2d 1249 (1989) (Gianetti I). See generally General Statutes § 52-235(a) (providing that "[t]he Superior Court, or any judge of the court, with the consent of all parties of record, may reserve questions of law for the advice of the Supreme Court or Appellate Court in all cases in which an appeal could lawfully have been taken to said court had judgment been rendered therein").
[7] The record discloses that the total number of emergency room cases that the plaintiff handled at all of the hospitals in each of the six years prior to the termination of his privileges varied from 168 to 217, and that the largest number of cases he handled in the Bridgeport hospitals during that period was approximately 130, in 1983. Specifically, the plaintiff handled: 86 cases in Norwalk and 95 in Bridgeport in 1978, for a total of 181 cases; 89 cases in Norwalk and 79 in Bridgeport in 1979, for a total of 168 cases; 72 cases in Norwalk and 97 in Bridgeport in 1980, for a total of 169 cases; 97 cases in Norwalk and 114 in Bridgeport in 1981, for a total of 211 cases; and 103 cases in Norwalk and 114 in Bridgeport in 1982, for a total of 217 cases. The plaintiff handled 46 cases in Norwalk in 1983 but gave inconsistent testimony regarding the number of cases that he had handled in Bridgeport in that year, testifying at one point that he did not recall how many Bridgeport cases he had handled that year, and at another point that it might have been 125 or 130, which, if correct, would have added up to a total of between 171 and 176 cases in 1983.
[8] The plaintiff handled emergency room cases in more than one hospital on 21 days in 1978, 12 days in 1979, 23 days in 1980, 28 days in 1981, and 30 days in 1982. The plaintiff also handled cases in both Norwalk and Bridgeport on 17 days in 1978, 12 days in 1979, 17 days in 1980, 16 days in 1981, and 19 days in 1982.
[9] The plaintiff handled more than one case at each of two different hospitals on 2 days in 1978, 2 days in 1980, 1 day in 1981, and 2 days in 1982. The plaintiff also handled more than one case at one of the two or three hospitals at which he worked on that day on 8 days in 1978, 5 days in 1979, 9 days in 1980, 11 days in 1981, and 7 days in 1982.
[10] This calculation does not take into account that the plaintiff may have been scheduled for on-call duty in the Bridgeport hospitals on days when he was not scheduled for on-call duty at Norwalk Hospital.
[11] The only evidence on the commuting distance from the plaintiff's office to the hospitals was provided by the hospital's expert witness, Edward M. Adams, Jr., who testified that the approximate travel time between the plaintiff's office in Bridgeport and Norwalk Hospital was thirty minutes, between his office and Bridgeport Hospital was fifteen minutes, between his office and St. Vincent's Hospital was three minutes, and between Norwalk Hospital and Bridgeport Hospital was twenty-three minutes.
[12] The plaintiff handled 158 more Bridgeport cases in 1984 than he did on average in the six preceding years, a number determined by subtracting the average number of cases that the plaintiff had handled each year in Bridgeport for the years 1978 through 1983(105) from the 263 Bridgeport cases that he handled in 1984.
[13] The plaintiff handled an average of 82 cases in Norwalk each year from 1978 through 1983.
[14] In Gianetti II, we reasoned as follows: "We have not addressed the remaining prong of the lost volume seller test, namely, whether it would have been profitable for the plaintiff to have maintained his contract with the hospital while increasing his workload elsewhere. In the context of this caseone involving a contract for personal servicesthe relevant inquiry under the profitability prong is whether the plaintiff could have performed under the contract with the hospital and assumed the increased workload at the other hospitals the year after the breach without having incurred additional costs that would have eliminated the profitability of such an increased workload.... [T]he plaintiff presented evidence at the hearing in damages demonstrating that he could have . . . [worked for] the hospital profitably while serving several [Bridgeport] hospitals. Furthermore, there was no evidence that, as the plaintiff performed more medical and surgical procedures, the corresponding costs eventually would eliminate the profitability of such work. See 3 Restatement (Second), supra, at § 347, comment (f), p. 117 (`[I]t is possible that an additional transaction would not have been profitable and that the injured party would not have chosen to expand his business by undertaking it had there been no breach. It is sometimes assumed that he would have done so, but the question is one of fact to be resolved according to the circumstances of each case.'); cf. R.E. Davis Chemical Corp. v. Diasonics, Inc., 826 F.2d 678, 684 (7th Cir. 1987) (`as a seller's volume increases ... a point will inevitably be reached where the cost of selling each additional item diminishes the incremental return to the seller and eventually makes it entirely unprofitable to conclude the next sale' . . .). Although the trial court correctly may have observed that the plaintiff's work for the hospital was not as profitable as it was at some of the [Bridgeport] hospitals, testimony adduced at the hearing in damages, as well as the reasonable inferences that can be drawn therefrom, supports the claim that it would have been profitable for the plaintiff to continue working for the hospital while increasing his workload elsewhere. Thus, the record supports the Appellate Court's conclusion that it would have been profitable for the plaintiff to [work for] the hospital while assuming an increased workload at the [Bridgeport] hospitals. See Gianetti v. Norwalk Hospital, supra, 64 Conn. App. at 229, 779 A.2d 847." (Citation omitted.) Gianetti v. Norwalk Hospital, supra, 266 Conn. at 563-64 n. 10, 833 A.2d 891.
[15] The court observed that there were two other plastic surgeons in Norwalk Hospital's emergency room on-call rotation from 1978 to 1981, not including the plaintiff, three in 1982, 1984 and 1985, four in 1986 and 1987, six in 1988, seven in 1989, and eight from 1990 to 1995.
[16] Eighty-nine is the median number of emergency room cases that the plaintiff handled at Norwalk Hospital for the years 1978 to 1982.
[17] The plaintiff handled 86 Norwalk Hospital cases in 1978, 89 cases in 1979, 72 cases in 1980, 97 cases in 1981, and 103 cases in 1982. The plaintiff handled only 46 cases in 1983 but explained that this noticeable reduction was due to his issues with the hospital during that year. See footnote 7 of this opinion.
[18] The plaintiff handled 263 cases in the Bridgeport hospitals in 1984, 206 cases in 1985, 160 in 1986, 218 in 1987, and 197 in 1988.
[19] The exhibit indicated that the plaintiff handled the following amount of cases at the Bridgeport hospitals between 1989 and 1999: 152 cases in 1989; 114 cases in 1990; 92 cases in 1991; 79 cases in 1992; 80 cases in 1993; 61 cases in 1994; 68 cases in 1995; 84 cases in 1996; 85 cases in 1997; 82 cases in 1998; and 38 cases in 1999.

To the extent that the plaintiff challenges this conclusion by citing Singer's testimony that the number of general emergency room visits nationwide increased in the 1990s, that fact is not inconsistent with evidence in the record that the number of emergency room plastic surgery procedures decreased in the 1990s. Singer testified that factors such as the increased use of seat belts and air bags, fewer drunken drivers due to stricter laws, and an increased tendency for emergency room physicians to perform work on minor lacerations had the effect of reducing the number of emergency room calls for plastic surgeons, in particular.
[20] Seven plastic surgeons were on call at Norwalk Hospital in 1989, and eight plastic surgeons were on call from 1990 through 1995.
[21] The plaintiff testified that the increasing number of on-call plastic surgeons could have been one of the reasons for the decline in the number of his on-call cases at the Bridgeport hospitals in the 1990s.
[22] Calabrese testified that health insurance companies gradually became the most common source of reimbursement and that emergency room income had "drastically" declined because of this development.
[23] The hospital's expert witness, John Allen Kosowsky, testified that a certain number of uninsured patients did not pay for their treatment. The plaintiff further testified that emergency room physicians sometimes treated uninsured patients, who were less likely to pay for their treatment.
[24] The plaintiff maintained an office in Westport, a town in close proximity to the city of Norwalk, to qualify for privileges at Norwalk Hospital.
[25] The court based its calculations on eighty-nine patients and per patient fees adjusted by the consumer price index for medical services provided by the plaintiff in the first formula.
[26] Illustration 16 in § 347 of the Restatement (Second) of Contracts, provides: "A contracts to pave B's parking lot for $10,000. B repudiates the contract and A subsequently makes a contract to pave a similar parking lot for $10,000. A's business could have been expanded to do both jobs. Unless it is proved that he would not have undertaken both, A's damages are based on the net profit he would have made on the contract with B, without regard to the subsequent transaction."
[27] This complaint was preceded by the plaintiff's original complaint filed in January, 1984, and his first amended complaint dated August 1, 2007.
[28] General Statutes § 37-3a provides in relevant part: "(a) Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable. . . .

"(b) In the case of a debt arising out of services provided at a hospital, prejudgment and postjudgment interest shall be no more than five per cent per year. The awarding of interest in such cases is discretionary."
[29] The plaintiff filed his motion for articulation on June 12, 2009. The hospital filed a similar motion on August 25, 2009.
[30] The plaintiff's reliance on Harris v. Bradley Memorial Hospital & Health Center, Inc., 296 Conn. 315, 994 A.2d 153 (2010), is misplaced. In Harris, we concluded that the trial court improperly denied the plaintiff's motion for punitive damages because the evidence was sufficient to show that the defendant hospital had acted with intent to injure or in reckless disregard of the plaintiff's rights. Id., at 346-48. Harris thus did not involve a claim for attorney's fees based on the defendant hospital's bad faith conduct, and our holding in that case, which was premised on an entirely different standard, is inapplicable in the present case.