******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CCT COMMUNICATIONS, INC. *v.*
ZONE TELECOM, INC.
(SC 19574)

Rogers, C. J., and Palmer, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued November 7, 2016—officially released February 21, 2017*

*Joseph K. Scully*, with whom was *Jeffrey P. Mueller*, for the appellant (plaintiff).

*William M. Murphy*, for the appellee (defendant).

*Opinion*

EVELEIGH, J. The plaintiff, CCT Communications, Inc., appeals from the judgment of the trial court rendered in favor of the defendant, Zone Telecom, Inc.,[1] on the plaintiff's complaint and the defendant's counterclaim for damages. The case arises from a purchase agreement (purchase agreement) entered into by the parties in which the plaintiff was to provide various telecommunications equipment, software, and services to the defendant for a switch room located in Los Angeles, California (switch room). On appeal, the plaintiff claims that the trial court incorrectly rendered judgment in favor of the defendant on its complaint and the defendant's counterclaim. Specifically, the plaintiff asserts that the trial court incorrectly: (1) concluded that it breached the purchase agreement; (2) failed to award the plaintiff certain damages on count one of its complaint; and (3) awarded damages, costs and attorney's fees in excess of a limitation of liability clause in the purchase agreement.[2] We disagree with the plaintiff and, accordingly, affirm the judgment of the trial court.

The following facts, as found by the trial court, are relevant to the issues on appeal. "The plaintiff . . . and the defendant . . . first began doing business together in September, 2005. [The plaintiff] provided various telecommunications equipment, software, and services to [the defendant for the switch room]. This relationship was memorialized in an original contract and subsequent modifications by way of letters of intent.

"By September, 2006, the relationship was deteriorating. [The plaintiff] is the alter ego of Dean Vlahos, its president. He was and is the sole decision maker, negotiator, and overseer of [the plaintiff]. . . . Vlahos met with [the defendant's] decision makers on September 14, 2006, at [the defendant's] Cherry Hill, New Jersey office. Present at the meeting . . . were Daniel Boynton [the defendant's senior vice president] and Eamon Egan [the defendant's vice president and chief legal counsel]. The meeting grew heated and ended without an agreement to continue to do business together. Over the ensuing weeks, however, the parties finally reached a meeting of the minds to restructure their relationship.

"The new contract was memorialized in [the purchase agreement, which was] dated November 1, 2006. . . . This is the sole document that requires reference regarding all of the terms and conditions of the parties' agreement. . . .

"[T]here is a third entity that was involved in the activities that underlie this case. It interrelated with both [the plaintiff] and [the defendant] but never was made a party, namely, Global Crossing Telecommunication, Inc. [Global].

"[Global] is a supplier of long-distance telephone service, providing national and international long-distance

[calling] as well as . . . toll-free service. [Global] markets its product to industry by varying rates depending on what services the customer requires. If [a customer] contracts for [Global's] services, then calls made under [that] contract would be run through a . . . DS-3 circuit [circuit], which would be provided as part of the transaction for the services. [A circuit] normally is purchased by the consumer as part of [an] agreement to use [Global's] long-distance services and rates.

"[Global] was a vital component to the fulfillment of the [purchase agreement] . . . . By virtue of the [purchase] agreement, [the plaintiff] was acting as a middle man in providing long-distance . . . service to [the defendant]. What [the plaintiff] 'sold' to [the defendant] was two . . . circuits [that the plaintiff] owned located in the [switch room]. In return for [the plaintiff's] purchase and ownership of the . . . circuits, [the defendant] purchased from [the plaintiff] its long-distance . . . service at the rates enumerated in the [purchase agreement] for the specified geographical areas. [The defendant] needed [one of these circuits] to enable it to run long-distance service to [Global] for placement of calls for [the defendant's] clients. [The plaintiff] was providing [the defendant] with long-distance service through its own agreement with [Global]. Stated differently, [Global] sold long-distance service to [the plaintiff] at a certain rate per minute, and [the plaintiff] resold that long-distance service to [the defendant] at a marked up rate. Even the marked up rate proved to be favorable to [the defendant], as it was not a rate that [the defendant] itself could have acquired from [Global]. [The plaintiff] profited from the marked up amount that it was charging to [the defendant] above the rate it was being charged by [Global]. [The defendant] in turn provided long-distance service at a marked up rate per minute based on what it was paying [the plaintiff] for those minutes. More facts will be provided as needed in this decision concerning the interplay between the parties' reliance on [Global's] circuitry and the performance of the [purchase agreement].

"The [purchase agreement] . . . was executed and effective on November 1, 2006. Long-distance service to be provided by [the plaintiff] to [the defendant] was to commence on December 1, 2006. The [purchase agreement] had a minimum usage guarantee . . . on a 'take or pay' basis. What this means is that [the defendant] was to pay a set amount per month as a minimum for long-distance service to be provided by [the plaintiff]. Any usage above the minimum required amount would be billed to [the defendant] at the agreed rate per minute. Also, because the price for use was on a 'take or pay' basis, [the defendant] was not required to use or run any traffic over [its circuit]. Even if [the defendant] did not run any calls through [its circuit] or failed to run enough minutes to satisfy the monthly [minimum usage guarantee, the defendant] neverthe-

less would be obligated to pay [the minimum usage charge].

"By December 1, 2006, the . . . circuit[s] that [the plaintiff] purchased [were] moved . . . to [the switch room] to handle [the defendant's] long-distance service. [The defendant] did run enough long-distance service through [its] circuit in the month of December, 2006, to meet its minimum usage requirement.

"Also, in December, 2006, [the plaintiff] and [Global] amended their retail customer agreement [retail customer agreement]. After execution of [this amendment], [the plaintiff] began to run more long-distance service through [Global]. . . .

"By mid-January, 2007, there was an ongoing dispute between [Global] and [the plaintiff] about the amount and scope of the long-distance service being sent by [the plaintiff] through [Global]. [Global] was concerned that [the plaintiff] was violating the amended retail customer agreement and taking unfair advantage to exploit [Global].

"The result of [the plaintiff] pushing so many long-distance calls through the . . . circuit[s] [was] that there were increasing numbers of service problems . . . . The calls would not complete . . . would continue to ring, or the call would result in a fast busy signal or dead air. These issues were brought to [Global's] attention by way of 'trouble tickets.' [Global] was receiving trouble tickets from many of the [plaintiff's] calls. [The defendant] was authorized by the purchase agreement . . . to open trouble tickets directly with [Global] if [the defendant] had service problems. During January, 2007, [the defendant] filed trouble tickets with [Global] because of service problems with calls being routed through the . . . circuit to their service. These service issues included calls not completing, fast busy signals, [and] intermittent no ring back . . . .

"[Global] had grown concerned with [the plaintiff's] activities by January, 2007. [The plaintiff] had not been current with payment [for] the long-distance services being provided by [Global]. By [January], 2007, [the plaintiff] owed [Global] approximately $2 million . . . . In addition, [the plaintiff] was attempting to run more and more calls through . . . circuits, which . . . was creating service problems with the calls.

"These issues [regarding traffic and service] patterns being exploited by [the plaintiff], as well as [the plaintiff] exceeding its credit limits with [Global], were memorialized in a letter from [Global] to [Vlahos] on January 11, 2007. . . . [Global] also put [the plaintiff] on notice that if a resolution of these problems was not achieved, [Global] would terminate all services to [the plaintiff] on January 25, 2007.

"Between January 11, 2007, and January 25, 2007, [the plaintiff] continued to increase international and

domestic long-distance traffic through the . . . circuits, causing additional service problems . . . . [Global] reached a point when it began to 'throttle down' [the plaintiff's] access to its service. By [January 17, 2007], [Global] had blocked any further service to [the plaintiff] for international long-distance calls. The domestic long-distance calls were being pushed through at an excessive rate by [the plaintiff] after [that date]. This influx of domestic long-distance calls caused major service issues for [Global]—192,000 [calls would not complete] on [January 19, 2007] and 142,000 [calls would not complete] on January [20 and 21, 2007]. [Global] blocked all calls generated through [the plaintiff] on January 26, 2007. . . .

"On January 25, 2007, [Egan, who had since become the defendant's] chief financial officer, sent a letter to [the plaintiff] advising [it] of multiple service issues for long-distance calls being transmitted through [the] circuit. [The defendant] complained of 'dead air, which eventually goes to a fast busy.' [The defendant] requested assistance from [the plaintiff] to resolve these issues; otherwise, [the defendant] would not be committed by [the purchase agreement] to pay the [minimum usage charge] for January 2007, due to unacceptable service quality. . . .

"Also, on January 26, 2007, [Global] sent a letter to [the plaintiff] terminating their relationship, claiming that [the plaintiff was in breach of contract] because [it] was reselling the services . . . in contravention of [the retail customer agreement]. . . . This termination notice . . . was [faxed to the defendant's] switch room [by Global]. [Global] had been given the . . . switch room fax number as an additional fax number for [the plaintiff]. This number no longer was [the plaintiff's], so [the defendant's] receipt of this notice from [Global] was informative but unintended.

"As a result of the termination of service by [Global], which shut down all of [the plaintiff's] circuits, [the plaintiff] on January 29, 2007, filed a voluntary . . . petition [pursuant to chapter 11 of the United States Bankruptcy Code; see 11 U.S.C. § 1101 et seq.; in the United States Bankruptcy Court for the Southern District of New York]. Because of the bankruptcy stay provisions, the filing of the bankruptcy petition compelled [Global] to reconnect [the] circuits by January 31, 2007.

"On February 5, 2007, [the defendant] notified [the plaintiff] by letter . . . that it was exercising its right to terminate their [contractual relationship] . . . pursuant to [§] 7 (b) of the purchase agreement. This section provided that either party may terminate the [purchase] agreement upon thirty days written notice if either party had certain events take place, including the filing of a voluntary bankruptcy petition. This termination provision had been added during the drafting of

the purchase agreement at the insistence of [Vlahos].
. . .

"Between the February 5, 2007 termination letter from [the defendant] and March 24, 2007, there was a series of letters between . . . Vlahos and . . . Egan about their positions vis-a-vis the bankruptcy and the continuation of the [purchase agreement]. . . . [The plaintiff's] position was that the bankruptcy [proceedings] stayed the shut off of service by [Global] and, therefore, [the defendant] was obligated to either use [its] circuit . . . or pay the [minimum usage charge]. [The defendant's] position was that it had notified [the plaintiff] of service problems prior to the shut off by [Global] and then the shut off took place, which occurrence jeopardized service to [the defendant's] clients. Because of the instability of the relationship between [the plaintiff] and [Global], [the defendant] took the position that it could not continue to use [its] circuit for long-distance service unless it was given adequate assurance from [Global] through [the plaintiff] that it could rely on the service being operational and not subject to further shutdown. [The plaintiff] insisted that it was not committed by law to provide any such adequate assurance.

"Also, on March 15, 2007, the . . . circuit . . . through which [the defendant] would have run long-distance [calls], had gone into 'alarm,' which meant that the switch and ports were out of service. This event precipitated an inquiry from [Global], which monitored all of its switches. Upon confirmation that traffic was not running through the switch, [Global] removed service from the . . . circuit. This meant that the [circuit] was not operational and could no longer provide long-distance . . . service. This switch was never restored to working order; to do so would have required a request to [Global] by [the plaintiff] as its customer. [Global] never received such a request from [the plaintiff]. Consequently, as of March 15, 2007, the . . . circuit that would have run [the defendant's] long-distance [calls were] inoperable and [the defendant] could do nothing directly about this situation because it was [the plaintiff's] obligation to contact [Global] to restore the service. . . .

"From March 24, 2007, to November 25, 2009, there was sporadic correspondence . . . between [the plaintiff] and [the defendant]. The dispute between these parties played out in the [proceedings before the Bankruptcy Court]. The [plaintiff's] bankruptcy petition was dismissed on November 25, 2009 . . . . Throughout the nearly three years that the bankruptcy petition was pending, [the plaintiff] failed to either assume or reject the purchase agreement with [the defendant]. [The Bankruptcy Court] dismissed the [plaintiff's bankruptcy] petition due [to] the misrepresentations and misstatements made [by the plaintiff]. Also, [the Bank-

ruptcy Court] declined to retain jurisdiction over the adversary proceeding between [the plaintiff] and [the defendant]. [The Bankruptcy Court] did retain jurisdiction of the [plaintiff] and [Global's] adversary proceeding. Simultaneous with the dismissal of [the plaintiff's] bankruptcy petition, [Global] notified [the plaintiff] that it was electing to terminate and not renew its contract with [the plaintiff]." (Citations omitted.)

In its two count complaint, the plaintiff claimed: (1) breach of contract for the defendant's failure to pay the amounts owed; and (2) account stated. In response, the defendant filed an answer and counterclaim. In its three count counterclaim, the defendant: (1) alleged breach of contract for, inter alia, the plaintiff's failure to provide services under the purchase agreement; (2) sought a declaratory judgment that the defendant's obligations to the plaintiff were terminated no later than thirty days after the defendant's letter to the plaintiff dated February 5, 2007; and (3) sought a declaratory judgment that, inter alia, the plaintiff had no right to continue its utilization of the switch room.

The matter was tried to the trial court, which rendered judgment for the defendant on the plaintiff's complaint, and count one of the defendant's counterclaim in the amount of $694,000. In addition, the trial court awarded statutory costs in the amount of $655 and attorney's fees in the amount of $936,441.18. Finally, the trial court also rendered declaratory judgment as requested in count two of the defendant's counterclaim. This appeal followed.[3]

Following oral argument, this court, sua sponte, ordered the trial court to issue an articulation addressing the following two questions: (1) "In addition to finding in favor of [the defendant] on its declaratory judgment claim in count [two] of its counterclaim, did the trial court find that [the plaintiff] had breached [the purchase agreement by failing] to provide telecommunication services as alleged in count [one] of [the defendant's] counterclaim when it stated [that] '[t]he court finds that [the defendant] has presented ample evidence to establish each of the elements in support of its claim that [the plaintiff] breached its obligations under the purchase agreement . . . ?' "; and (2) "If the answer to question one is in the affirmative, then were the damages awarded by the trial court based upon the breach of contract as found by the court in count [one] of [the defendant's] counterclaim?"

In its subsequent articulation, the trial court responded to this court's first question as follows: "The response is in the affirmative that this court did find that [the defendant] had proven that [the plaintiff] had breached the purchase agreement . . . . [T]his court noted [in] its original decision [that] [t]he breach took place when [the plaintiff] filed its voluntary bankruptcy petition of January 29, 2007. Pursuant to [§] 7 (b) [of

the purchase agreement], [the defendant] exercised its right to terminate the purchase agreement on February 5, 2007. The court finds for [the defendant] on count [one] of its counterclaim for breach of contract."

In its articulation, the trial court responded to this court's second question as follows: "[T]his court's award of damages to the defendant was based upon the finding of the breach of contract by the plaintiff as alleged in count [one] of [the defendant's] counterclaim.

"This court heard evidence on damages both from [the] plaintiff as to its claims for breach of contract and the defendant as to its claims for breach of contract. This court found the supporting evidence favored the defendant's claim for breach of contract.

"Although the defendant presented evidence of damages far in excess of what this court ordered . . . [this] court found the liquidated damages clause [set forth in § 4 (c) of the purchase agreement] limited the extent of the damages that could be awarded to the defendant for the plaintiff's breach of contract. [This] court's award of damages to the defendant was based on the finding of the breach of the purchase agreement as alleged in count [one] of [the defendant's] counterclaim."

On appeal to this court, the plaintiff claims, inter alia, that the trial court incorrectly: (1) concluded that it breached the purchase agreement; (2) failed to award certain damages on count one of its complaint; and (3) awarded damages and attorney's fees in excess of the limitation of liability in the purchase agreement.

I

BREACH OF CONTRACT

We begin with the applicable legal principles and standard of review. "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Sullivan* v. *Thorndike*, 104 Conn. App. 297, 303, 934 A.2d 827 (2007), cert. denied, 285 Conn. 907, 942 A.2d 415 (2008). The trial court's factual findings as to whether and by whom a contract has been breached are subject to the clearly erroneous standard of review and, if supported by evidence in the record, are not to be disturbed on appeal. See Practice Book § 60-5; see also *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 70, 699 A.2d 101 (1997).

On appeal, the plaintiff claims that the trial court's sole factual basis for finding a breach of contract by the plaintiff was the bankruptcy petition. The plaintiff then analyzes the question under bankruptcy law and claims that, because of the bankruptcy petition in the present case, a question of law is presented which provides for de novo review. Contrary to the plaintiff's

position, the defendant claims that the trial court found that the plaintiff breached the purchase agreement by failing to provide services and, therefore, the trial court's factual findings as to whether the purchase agreement was breached by either party is subject to the clearly erroneous standard of review and, if supported by evidence in the record, are not to be disturbed on appeal. *Crowell* v. *Danforth*, 222 Conn. 150, 156, 609 A.2d 654 (1992). We agree with the defendant and apply the clearly erroneous standard.

On the issue of breach of contract, the trial court found as follows: "[The defendant] has presented ample evidence to establish each of the elements in support of its claim that [the plaintiff] breached its obligations under the purchase agreement . . . . The breach took place when [the plaintiff] filed its voluntary bankruptcy petition of January 28, 2007. Pursuant to [§] 7 (b) [of the purchase agreement], [the defendant] exercised its right to terminate the purchase agreement on February 5, 2007. The court finds for [the defendant] on count [one] of its counterclaim for breach of contract."

Count one of the defendant's counterclaim contains the following allegation: "[The plaintiff], by failing to provide the service it contracted to provide to [the defendant through the circuit], breached its obligations to [the defendant] under the terms of the [purchase] [a]greement." It certainly appeared that the trial court found that the plaintiff had breached the purchase agreement due to its failure to provide services. Due to the difference of opinion between counsel for the plaintiff and counsel for the defendant, however, we ordered the trial court to articulate its decision. In its articulation, the trial court left no doubt. "The response is in the affirmative that this court did find that [the defendant] had proven that [the plaintiff] had breached the purchase agreement . . . ." Therefore, we will evaluate this claim under the clearly erroneous standard of review.

There is no question that the trial court's finding that the plaintiff breached the purchase agreement by failing to provide the services is supported by numerous, detailed factual findings set out in the trial court's decision, all of which are, in turn, fully supported by the record.

The trial court correctly found that, because the purchase agreement called for the plaintiff to resell Global's services to the defendant, the relationship between the plaintiff and Global was central to the plaintiff's performance under the purchase agreement. The trial court also found that, almost immediately after entering the purchase agreement, the plaintiff embarked upon a course of dealing with Global that first jeopardized and impaired the plaintiff's ability to provide the services, and ultimately made the services completely unavailable to the defendant. The trial court's decision recited

at length the facts it found relevant to its "decision concerning the interplay between the parties' reliance on [Global's] circuitry and the performance of the [purchase agreement]." For example, the trial court found that "[b]y mid-January, 2007, there was an ongoing dispute between [Global] and [the plaintiff] about the amount and scope of the long-distance service being sent by [the plaintiff] through [Global]" and that Global had become "concerned" that the plaintiff was violating the retail customer agreement and taking unfair advantage [of Global]."

The trial court continued to find the following: "During January, 2007, [the defendant] filed trouble tickets with [Global] because of service problems with calls being routed through the . . . circuit to their service. . . . On January 25, 2007, [Egan] . . . sent a letter to [the plaintiff] advising [it] of multiple service issues for long-distance calls being transmitted through [its] circuit. . . . [The defendant] requested assistance from [the plaintiff] to resolve these issues; otherwise, [the defendant] would not be committed by [the purchase agreement] to pay the [minimum usage charge] for January, 2007, due to unacceptable service quality." The trial court noted the January 26, 2007 letter from Global to the plaintiff, which claimed that the plaintiff had breached the retail customer agreement by "reselling" the services Global provided to the plaintiff, and the fact that, "[a]s a result of the termination of service by [Global], which shut down all of [the plaintiff's] circuits, [the plaintiff] on January 29, 2007, filed [for bankruptcy]." Finally, the trial court noted the following: "[O]n March 15, 2007, the . . . circuit . . . through which [the defendant] would have run long-distance [calls], had gone into 'alarm,' which meant that the switch and ports were out of service. This event precipitated an inquiry from [Global], which monitored all of its switches. Upon confirmation that traffic was not running through the switch, [Global] removed service from the . . . circuit. This meant that the [circuit] was not operational and could no longer provide long-distance . . . service. This switch was never restored to working order; to do so would have required a request to [Global] by [the plaintiff] as its customer. [Global] never received such a request from [the plaintiff]. Consequently, as of March 15, 2007, the . . . circuit[s] that would have run [the defendant's] long-distance [calls were] inoperable and [the defendant] could do nothing directly about this situation because it was [the plaintiff's] obligation to contact [Global] to restore the service."

These detailed and fully supported factual findings underlie the trial court's ultimate finding that the defendant had proven the allegations set forth in the first count of its counterclaim—namely, that the plaintiff had breached the purchase agreement by failing to provide services. The trial court also made the explicit findings

about the credibility of witnesses, which support its conclusion finding in favor of the defendant. Specifically, the trial court found as follows: "The court would be remiss if it did not comment on the credibility of the testimony and evidence. The principal witnesses were [Vlahos] for [the plaintiff] and [Egan] for [the defendant].

"[Vlahos] testified over the course of five days. [Vlahos'] testimony was lacking in credibility and candor. He failed to answer direct questions, instead launching into a long narrative where he attempted to spin a response in justification of his position. His testimony went beyond self-serving. He was evasive and obstructive in his responses during cross-examination. For the most part, [Vlahos'] testimony was disingenuous and manipulative of the facts.

"[Egan's] testimony was more logical and supported by the documentary evidence. [Egan's] testimony was more credible than [Vlahos'] as to the pertinent events that took place between [the plaintiff and the defendant] regarding the purchase agreement, the eventual breach, and subsequent events."

On the basis of the foregoing, we conclude that the trial court's findings are supported by the record and, therefore, are not clearly erroneous. Because the trial court's finding that the plaintiff breached the purchase agreement by failing to provide the services is supported by the record and by the trial court's explicit credibility findings on the issue of which party breached the contract, those findings are entitled to deference by this court and may not be disturbed. See *Crowell* v. *Danforth*, supra, 222 Conn. 156 (trial court's findings binding on appeal unless clearly erroneous); see also *United Components, Inc.* v. *Wdowiak*, 239 Conn. 259, 262–63, 684 A.2d 693 (1996) (deference to trial court's findings is particularly appropriate where there is conflicting testimony).

Our conclusion that the trial court's finding that the plaintiff breached the purchase agreement by failing to provide the services was supported by the record and was not clearly erroneous makes it unnecessary to reach the issue of whether the trial court was correct in also granting the declaratory judgment sought in count two of the defendant's counterclaim—namely, a judgment declaring that the defendant's exercise of its contractual right to terminate the purchase agreement due to the plaintiff's bankruptcy was valid and effective. The trial court's explicit findings that the plaintiff was responsible for making the services unavailable to the defendant no later than March 15, 2007, and that the service remained unavailable to the defendant through the remainder of the purchase agreement's term, coupled with the undisputed fact that the defendant made no use of its circuit after January 25, 2007, mean that the defendant would be entitled to damages and attor-

ney's fees regardless of whether the court was also correct in deciding that the defendant's February 5, 2007 notice of termination was valid and effective. Therefore, there is no need for us to discuss the import of the plaintiff's bankruptcy petition and, accordingly, we decline to address that issue. See footnote 2 of this opinion.

## II

### DAMAGES CLAIMED BY THE PLAINTIFF

The plaintiff next claims that the trial court incorrectly failed to grant the plaintiff any relief on count one of its complaint for the defendant's failure to pay invoices for actual usage, shortfall charges, and interest for the contract period preceding the termination.[4] The plaintiff claimed damages for the defendant's failure to pay invoices for December, 2006, through March, 2007. It claims that the court erred in failing to award damages in the amount of $221,390.99 plus interest at a rate of 1.5 percent. We disagree.

In its articulation, the trial court explained as follows: "This court heard evidence on damages both from [the] plaintiff as to its claims for breach of contract and the defendant as to its claims for breach of contract. This court found the supporting evidence favored the defendant's claim for breach of contract."

The trial court's finding as to whether the plaintiff met its burden of proving a breach of contract claim represents a factual determination. As we have explained previously in this opinion, "[t]he trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses." (Citations omitted; internal quotation marks omitted.) *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.*, 207 Conn. 468, 473, 542 A.2d 692 (1988). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Crowell* v. *Danforth*, supra, 222 Conn. 156.

On the basis of the trial court's articulation, credibility determinations and the evidence in the record, we cannot conclude that the trial court's finding that the plaintiff did not establish its breach of contract claim is clearly erroneous. Nothing in the record establishes that the plaintiff was damaged by the defendant's failure to pay the December, 2006 and January, 2007 invoices. Specifically, the plaintiff points to nothing in the record to establish that the plaintiff ever paid anything to Global for the services resold to the defendant on the December, 2006 and January, 2007 invoices. Moreover,

any damages pertaining to invoices after January, 2007, are foreclosed by the trial court's well supported factual findings that the plaintiff breached the purchase agreement by making its services unavailable to the defendant.[5] Accordingly, we cannot conclude that the trial court's finding that the plaintiff failed to prove its breach of contract claim was clearly erroneous.

### III

### AWARD OF DAMAGES TO THE DEFENDANT

The plaintiff claims that the trial court incorrectly awarded damages to the defendant in excess of a provision in the purchase agreement that limited damages. The plaintiff claims that this court should review its claim de novo because it involves the interpretation of the unambiguous language of the purchase agreement, which the trial court found enforceable. Whereas, the defendant asserts that the trial court's damages award, given the limitation on liability imposed by the purchase agreement, was based on findings of fact regarding the damage suffered because of the plaintiff's breach and the consideration the defendant paid to the plaintiff under the purchase agreement. Therefore, the defendant claims that these factual findings are subject to review under the clearly erroneous standard and may not be disturbed unless found without support in the record.

"The standard of review for the interpretation of a contract is well established. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [however, when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]. . . . If the language of [a] contract is susceptible to more than one reasonable interpretation, [however] the contract is ambiguous. . . . Ordinarily, such ambiguity requires the use of extrinsic evidence by a trial court to determine the intent of the parties and, because such a determination is factual, it is subject to reversal on appeal only if it is clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7, 931 A.2d 837 (2007). Once the trial court interprets the provisions of a contract, however, the calculation of a party's specific damages under the contract is a factual determination, which may only be reversed if it is clearly erroneous. *Gianetti* v. *Norwalk Hospital*, 304 Conn. 754, 780, 43 A.3d 567 (2012). We consider the terms of the contract in this case to be both clear and unambiguous. Therefore, in determining the meaning of the purchase agreement, we exercise plenary review.

Section 4 (c) of the purchase agreement provides in relevant part: "In no event shall [the plaintiff's] liability

arising out of this agreement exceed the amount paid to [the plaintiff] by [the defendant] for the specific purchased equipment or services giving rise to such liability. . . .”

The plaintiff argues that, although the defendant made an initial payment of $459,000, the purchase agreement makes clear that this payment was for equipment and not services. It claims that, since the trial court found the limitation on liability enforceable, the trial court erred in awarding the defendant damages and attorney's fees in excess of the amount paid by the defendant for services. In response, the defendant argues that the trial court heard testimony from both sides about the payment terms of the purchase agreement, including the defendant's initial payment of $459,000, and that, because there was no dispute that the defendant had paid $459,000 to the plaintiff for equipment, the trial court properly included that sum when calculating the limitation of liability under the purchase agreement.

In the present case, the trial court found that the defendant had paid the plaintiff a total of $694,000 pursuant to the purchase agreement. It reached this sum by adding the defendant's initial payment of $459,000 to the $235,000 credit on the defendant's account.[6] The trial court found the limiation of liability clause in the purchase agreement enforceable and, accordingly, limited the damages on the defendant's breach of contract counterclaim to $694,000.

The plaintiff argues that, because the defendant never paid for services, and because the $459,000 the defendant initially paid was for equipment and not services, the trial court should not have awarded any money to the defendant.[7] We disagree. The purchase agreement provides that “[i]n no event shall [the plaintiff's] liability . . . exceed the amount paid to [the plaintiff] by [the defendant] for the specific *purchased equipment or services* giving rise to such liability.” (Emphasis added.) This language is unambiguous. There is no question that the moneys considered by the trial court in calculating the limitation of damages went to the purchase of equipment. The plaintiff's interpretation of the limitation of liability clause would focus only on the term “services” and omit the language relating to equipment. Since both the credit on the defendant's account of $235,000 and the defendant's initial payment of $459,000 went to equipment, the trial court correctly included those sums when calculating the limitation of damages. The trial court's interpretation of this provision in the purchase agreement is correct, and its award is fully supported by the evidence.

In addition, we note that the trial court correctly considered the applicability of the limitation of liability clause to the issue of damages. In its articulation the trial court stated as follows: “[T]his court's award of

damages to the defendant was based upon the finding of the breach of contract by the plaintiff as alleged in count [one] of [the defendant's] counterclaim. This court heard evidence on damages both from [the] plaintiff as to its claims for breach of contract and the defendant as to its claims for breach of contract. This court found the supporting evidence favored the defendant's claim for breach of contract. Although the defendant presented evidence of damages far in excess of what this court ordered, as referenced in this court's original decision, the court found the liquidated damages clause in the purchase agreement . . . limited the extent of the damages that could be awarded to the defendant for the plaintiff's breach of contract. The court's award of damages to the defendant was based on the finding of the breach of the purchase agreement as alleged in count [one] of [the defendant's] counterclaim."

Accordingly, we conclude that the trial court's award of damages to the defendant in the amount of $694,000 is not only based upon a correct interpretation of the limitation of liability clause set forth in the purchase agreement, but is also supported by the record.

The plaintiff also claims that the trial court incorrectly awarded the defendant damages and attorney's fees in excess of the amount paid by the defendant to the plaintiff. It claims that contractual limitations on liability involving telecommunications services are enforceable except for gross negligence or wilful misconduct. See, e.g., *In re CCT Communications, Inc.*, 464 B.R. 97, 108–15 (Bankr. S.D.N.Y. 2011). Essentially, the plaintiff argues that the award of attorney's fees by the trial court exceeded the limitation of liability clause set forth in the purchase agreement. We disagree.

The trial court did not award attorney's fees under the limitation of liability clause. The trial court indicated in its decision that "[t]here remains the issue of costs and reasonable attorney's fees to be awarded . . . pursuant to . . . the purchase agreement." Subsequently, the trial court rendered a judgment for that included attorney's fees in the amount of $936,441.18. At the outset, we note that, to the extent this issue requires interpretation of the purchase agreement, we apply plenary review. See *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, supra, 284 Conn. 7. Again, we find that the relevant terms of the contract clause are clear and unambiguous.

Section 16 of the purchase agreement is entitled "Costs & Attorney's Fees." It provides: "If either party to this [a]greement brings any action, claim, or proceeding against the other party to this [a]greement arising under this [a]greement, or to enforce any of the terms of this [a]greement, or otherwise pertaining to the subject matter of this [a]greement, then the prevailing party shall be entitled to recover from the other party the actual costs and reasonable attorney's fees incurred

thereby, and whether such action, claim, or proceeding is [prejudgment] or [postjudgment]."

On appeal, the plaintiff has only challenged the applicability of the limitation of liability clause to the award of attorney's fees and has not challenged the reasonableness of the award of costs and attorney's fees.

A review of the purchase agreement demonstrates that the award of costs and attorney's fees were not to be considered by the parties as damages subject to the limitation of liability clause. First, the limitation of liability clause does not mention costs or attorney's fees. To the contrary, costs and attorney's fees are addressed in a separate section of the purchase agreement. Second, the attorney's fees clause does not mention the limitation of liability clause, or otherwise indicate that it is subject to that clause. Third, the award of attorney's fees is only to be paid to the prevailing party. In the context of this case, that would have only been decided after a full trial and after all of the evidence of damages had been presented. For this reason, the trial court held a separate proceeding in order to award attorney's fees. Accordingly, we conclude that the trial court correctly concluded that the award of costs and attorney's fees in the present case was not subject to the limitation of liability clause contained within the purchase agreement.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] We note that, after the present action was commenced, Zone Telecom, Inc., became ANPI Business, LLC. For the sake of clarity, we note that references in this opinion to the defendant are to Zone Telecom, Inc.

[2] The plaintiff also asserts that the trial court incorrectly determined that a letter from the defendant dated February 5, 2007, was an effective exercise of the defendant's right to terminate and that the plaintiff breached the purchase agreement by filing a bankruptcy petition. Because we conclude that the trial court properly determined that the plaintiff breached the purchase agreement by failing to provide the agreed upon services, we need not reach these issues.

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] We note that the trial court rendered judgment in favor of the defendant on count two of the plaintiff's complaint, which asserted a claim for account stated. The plaintiff did not appeal from the judgment of the trial court on count two of the complaint. Its only claim on appeal regarding the defendant's failure to pay the invoices relates to the trial court's failure to award damages for count one of the complaint, which alleged breach of contract.

[5] As discussed previously in this opinion, this finding rests on, inter alia, the service disruptions in January, 2007, the removal of service by Global on March 15, 2007, and the plaintiff's subsequent failure to take any steps to restore service.

[6] This credit reflects a loan from the defendant that enabled the plaintiff to purchase equipment prior to the execution of the purchase agreement. As discussed previously in this opinion, the plaintiff undertook an obligation to repay this loan through credits on the defendant's account. The plaintiff's brief does not, however, mention this loan in relation to the limitation of damages.

[7] The plaintiff reaches this conclusion without any discussion of the $235,000 credit on the defendant's account. See footnote 6 of this opinion.